[Civ. No. 45037. Second Dist., Div. Three. Dec. 27, 1974.]

ADVANCE TRANSFORMER COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
JOSEPH SHAPIRO et al., Real Parties in Interest.

128

**COUNSEL**

Alexander, Inman & Fine and Lowell R. Wedemeyer for Petitioner.

John H. Larson, County Counsel and Dwight V. Nelsen, Deputy County Counsel, for Respondent.

Quittner, Stutman, Treister & Glatt and Theodore B. Stolman for Real Parties in Interest.

**OPINION**

**POTTER, J.**—As the return of respondent superior court states: "The instant petition presents an issue of first impression in this state" respecting the availability of the remedy of attachment in actions against individual guarantors of the obligations of business corporations and accommodation makers of notes evidencing their business debts, under the provisions of Code of Civil Procedure sections 537.1 and 537.2.[1]

Petitioner, a supplier of transformer components used in fluorescent lighting fixtures, brought suit against defendant Supreme Lighting Co., Inc. (hereinafter referred to as "Supreme Lighting") and Joseph and

---

[1]All references herein to sections of the Code of Civil Procedure numbered between 537 and 542c are to the text operative until December 31, 1975..

Margery Shapiro (real parties in interest) upon a note in the principal sum of $108,410.27. The promissory note was executed by both of the Shapiros in behalf of "Supreme Lighting Co., Inc., Maker," as its president and secretary respectively, and by "Joseph Shapiro, Maker," and "Margery A. Shapiro, Maker," individually.

Petitioner applied for an attachment pursuant to section 538 of the Code of Civil Procedure. A notice of hearing was issued pursuant to section 538.1 and thereafter a hearing was conducted pursuant to section 538.4. The primary issue at the hearing was "whether the case is one in which an attachment is properly issuable" (Code Civ. Proc., § 538.4) under the provisions of sections 537.1 and 537.2. The pertinent portions of these sections provide: "An action referred to in Section 537 is an action or actions by the same plaintiff in which the total sum claimed, exclusive of interest, attorneys' fees and costs, is five hundred dollars ($500) or more and which is one or more of the following:

"(a) An action against a defendant described in subdivision (a), (b) or (c) of Section 537.2 for a liquidated sum of money based upon

"(1) Money loaned; or

"(2) A negotiable instrument; or

"(3) The sale or lease of, or a license to use, real or personal property (including, without limiting the generality of the foregoing, goods sold and delivered on open account); or

"(4) Services rendered,

if the claim is not secured by any mortgage, deed of trust or security interest on real or personal property or, if originally so secured, such security has, without any act of the plaintiff, or the person to whom the security was given, become valueless. The fact that interest, attorneys' fees, costs or any combination thereof are claimed by the plaintiff in addition to the principal amount of the debt shall not make the claim unliquidated within the meaning of this section.

"(b) . . . ." (Code Civ. Proc., § 537.1.)

"The defendants referred to in Section 537 are:

"(a) All corporations organized under the General Corporation Law or under Part 4 (commencing with Section 13400) of Division 3 of Title 1 of the Corporations Code, or organized under a law of any foreign state or jurisdiction authorizing the formation of business corporations.

"(b) All partnerships organized under the Uniform Partnership Act (Chapter 1 (commencing with Section 15001) of Title 2 of the Corporations Code) or the Uniform Limited Partnership Act (Chapter 2 (commencing with Section 15501) of Title 2 of the Corporations Code) or

a law of any foreign state or jurisdiction authorizing the formation of general or limited partnerships.

"(c) Individuals engaged in a trade or business.

"(d) . . . ." (Code Civ. Proc., § 537.2.)

Joseph Shapiro was called as a witness for petitioner. After he identified the signatures on the note, he testified that Supreme Lighting was in the business of "the manufacture of fluorescent lighting fixtures," that he was the president and a director, and that all of the shares were owned by him or by Margery Shapiro. Margery and a son were the other two directors. According to Shapiro, the promissory note represented the amount due on account of a series of business transactions comprising the purchase of fluorescent lighting components by Supreme Lighting from petitioner. The following testimony then ensued:

"Q. Now, Mr. Shapiro, why did you sign this note?

A. I signed the note as guarantor for the purchase of materials from Advance Transformer Company in order to postpone the payments and spread them out over a period of time and to keep my credit for future purchases open with the company.

Q. So that the issuance of this note was in part designed to keep a continuing flow of the delivery of materials to the business?

A. That's right."

Further testimony of Shapiro related to guarantees signed by him in favor of other firms which extended credit to Supreme Lighting. His testimony in this respect was as follows:

"Q. By Mr. Wedemeyer: Mr. Shapiro, have you given personal assurances or guarantees or promissory notes to other persons in the last six months? Have you signed any promissory notes?

A. Not specifically as promissory notes. I have signed guarantees.

Q. To whom did you sign such guarantees?

A. Universal Manufacturing Company and Trans West Financial Company.

Q. What was the business transaction in which you were involved with Universal?

A. Purchase of fluorescent ballasts.

Q. Where were those ballasts delivered?

A. Beg pardon?

Q. Where were they delivered?

A. To Supreme Lighting Company.

Q. What was the transaction with Trans West?

A. To secure finances."

At the conclusion of this testimony, petitioner indicated it was resting its case on the issue "whether the case is one in which an attachment is properly issuable." The court at this point stated: "I will tell you right now, we can go directly to the corporation, because based on the evidence submitted, I could not possibly find that he is engaged in the trade or business which would subject him to an attachment personally or Mrs. Shapiro, and therefore, let's not waste any more time on that. Go forward now."

The court had already indicated the basis of this ruling at an earlier point in the proceedings where the following statement was made: "MR. WEDEMEYER: Well, your Honor, I am submitting, and I am prepared to go into a substantial argument on that.

"THE COURT: We have had arguments at considerable length, and I have concluded that because a person is an officer, a director, or an employee, regardless of the size of his salary, does not constitute him engaged in the business of the corporation, nor if you add that he is the sole stockholder of a corporation unless you pierce the corporate veil is he engaged in the business of the corporation. He may be engaged in some other business, but he is not engaged in the business of the corporation unless you pierce the corporate veil."

The same ground for the denial of the attachment as against the Shapiros was restated at the conclusion of the proceedings in the following form: "THE COURT: You would have to establish that you would probably recover against the individuals at the time of trial as the alter ego of the corporation in order to have an attachment."

The application was granted insofar as it sought an attachment against attachable assets of the corporation and denied as to Joseph Shapiro and Margery A. Shapiro.

Petitioner bases the jurisdiction of this court in mandamus (1) upon its claim that under Code of Civil Procedure section 538.4 the court is required to direct the issuance of a writ of attachment when a plaintiff has established the statutory requisites therefor, (2) upon the lack of any right to appeal from the denial of a writ of attachment, and (3) upon the absence of a speedy and adequate remedy at law. By demurrer to the petition, real parties in interest have contested these claims. No extended discussion of this issue is necessary, however, inasmuch as the respon-

dent court has filed a return to the alternative writ in which a clear basis for this court's jurisdiction is made manifest.

The return filed by respondent court states in effect that the action taken in this case was an implementation of a policy or practice of the court, the effect of which, if erroneous, is a refusal to exercise the jurisdiction conferred upon it by Code of Civil Procedure section 538.4.

The practice of respondent court, according to its return, in a case in which an attachment is sought against a person other than the "primary obligor"[2] (e.g., against a guarantor) based upon a transaction qualifying under section 537.1, is as follows: "[I]t has been respondent Court's practice, in the absence of any other guidelines, to require a showing of the traditional elements of alter ego warranting the ignoring of the corporate entity and justifying a finding that the individual is conducting the business of the corporation." The return of respondent court concludes as follows: "In the event this conclusion is deemed inaccurate, it is respectfully requested that this Honorable Court state guidelines for determining the scope and meaning of the phrase 'individual engaged in a trade or business' (under CCP 537.2(c)) . . . ."

Under the circumstances, it is appropriate for this court to pass upon the propriety of respondent court's practice and direct the proper exercise of the superior court's function in this respect. The issues determinative of this proceeding may, therefore, be rather narrowly defined; they are:

*Issues*

1. Does section 537.2 of the Code of Civil Procedure, by requiring that an individual defendant against whom an attachment is issued be "engaged in . . . business," limit the remedy to actions to enforce claims based upon transactions in which he is primary obligor or the primary obligor is his *alter ego*?

2. If, under such circumstances, the *alter ego* doctrine is not the proper standard to determine whether a defendant is "engaged in . . . business," what is the proper standard?

---

[2]Section 537.1 authorizes attachments in actions upon claims which are based upon loans, negotiable instruments, sales or services. The term "primary obligor" will henceforth be employed in this opinion to refer respectively to the borrower, maker, purchaser, or person to whom services are rendered.

The phrase "engaged in business" has been employed in a veritable host of statutes, both federal and state, relating to a variety of different subjects. As early as 1910 the United States Supreme Court, in *Flint* v. *Stone Tracy Co.,* 220 U.S. 107 [55 L.Ed. 389, 31 S.Ct. 342], in passing upon whether certain parties before it were engaged in business within the provisions of a federal excise tax upon the privilege of carrying on business as a corporation, stated as follows (220 U.S. at p. 171 [55 L.Ed. at p. 421]): "It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict., 158, citing *People* v. *Commissioners of Taxes,* 23 N. Y. 242, 244. 'That which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, Vol. I, p. 273."

California decisions have ascribed the same comprehensive meaning to the term "business." For example, in *Long* v. *City of Anaheim,* 255 Cal.App.2d 191 [63 Cal.Rptr. 56], which involved the application of a business license tax, the court said (at p. 197): "*Business* in its broad sense embraces everything about which one can be employed; the word is often synonymous with calling, occupation, or trade engaged in for the purpose of obtaining a livelihood or profit or gain. (*Mansfield* v. *Hyde,* 112 Cal.App.2d 133, 137 [245 P.2d 577].) ' "Business" is defined to be that which occupies the time, attention and labor of men for the purpose of livelihood or profit . . . [citations]. An occupation or employment will not be excluded from the classification of business merely because it actually results in loss instead of profit; but it is essential that livelihood or profit be at least one of the purposes for which the employment is pursued, in order to bring it within the accepted definition of the word . . . .' (*Deering* v. *Blair,* 23 F.2d 975, 976 [57 App.D.C. 367].)"

■ The term "business," therefore, embraces any activity engaged in for profit or for gain. ■ The phrase "engaged in business," however, generally is held to imply business activity of a frequent or continuous nature. In *City of Los Angeles* v. *Cohen,* 124 Cal.App.2d 225 [268 P.2d 183], this court affirmed a judgment in favor of the City of Los Angeles for unpaid license taxes imposed under a city ordinance upon "every person engaged in the business of loaning money, advancing credit, or loaning credit . . . ." The judgment appealed from was against an accountant who, in addition to practicing his profession, "accommodated" a friend who was a principal shareholder of a family-owned corporation which was having financial difficulties. This accommodation

included the accountant's purchase of accounts receivable, embracing several thousand invoices over a three-year period, during which he also guaranteed one large account payable by the corporation. Holding that this constituted engaging in the business of advancing credit under the statute, the court said (124 Cal.App.2d at p. 228): "In the *Matter of Application of Smith,* 33 Cal.App. 161, 163 [164 P. 618], the court said: 'Business is defined as that which occupies the time, attention, or labor of men for the purpose of profit or improvement.' In 5 Words and Phrases, page 998 et seq., will be found a collection of cases from many jurisdictions which hold that ' "Business," in a legislative sense, is that which occupies the time, attention, and labor of men for purposes of livelihood or for profit; a calling for the purpose of a livelihood.' It is used in the latter meaning in the statutes relating to license taxes. (See also 12 C.J.S. p. 765 et seq.) The words 'engage,' 'engaged,' and 'engaging' relate to and connote frequency and continuity of action. Cases so holding are collected in 14A Words and Phrases, page 188 et seq. It is, of course, well established that a single or occasional disconnected act does not constitute 'engaging in business.'

"Over a three-year period plaintiff issued 190 checks in 190 transactions and purchased altogether 4,602 invoices under an agreement by which he bound himself for a period of one year to purchase Modern's accounts which were acceptable to him. There was both frequency and continuity in these transactions. Defendant derived substantial profits. The fact that he was at the same time accommodating a friend has no bearing upon the nature of the business, and since he derived profits from the business it is of no consequence whatever that he was led into the business by motives of friendship rather than the expectation of profit. He is deserving of credit, of course, but not on his tax liability. *Neither is it of any consequence that he may not have been dependent upon the business for his livelihood, and devoted but little time to it. The fact that he had but a single client and did not solicit business from others has no bearing upon the nature of the business.* In short, the question is not even a close one. Defendant had no tenable grounds nor reasonable excuse for refusing to pay the tax imposed by the ordinance." (Italics added.)

The meaning of the phrase "engaged in business" has been explored in a number of federal decisions dealing with a variety of federal statutes employing such language. In *Van Der Elst* v. *Commissioner of Internal Revenue* (2d Cir. 1955) 223 F.2d 771, the statute involved was section 211(b) of the Internal Revenue Code which exempted from taxation the income of nonresident aliens who were not "engaged in trade or business

within the United States." The petitioning taxpayer was a foreign diplomat on duty in the United States who accepted the office of vice-president of a New York candy company, for which he was to receive $100 per week compensation. During the tax period in question, however, he rendered no services. Nonetheless, he was held to be engaged in business in the United States. The court said (223 F.2d at p. 772): "Even if it be conceded that the petitioner rendered no services in 1946, although his presence in San Francisco would not have precluded his giving advice by telephone or letter as to the conduct of the company's business in New York, we think this fact is irrelevant. The argument presupposes that a corporate officer is engaged in business only while he is active in the work of the company. We cannot accept this assumption. A salary is paid not only to compensate for work performed but to secure a command over the employee's services. For instance, no one would say that an employee or corporate officer ceased to be engaged in business while on vacation, because he performed no active work during the vacation period. The statute should not be given a construction so limited. The taxpayer never decided to quit as vice-president of the company until he was called away to become Ambassador to Portugal. Up to that time he was receiving pay for services or for a call on his services. Hence he was 'engaged in business' within the United States."

The same exemption was involved in *Commissioner of Internal Revenue* v. *Nubar* (4th Cir. 1950) 185 F.2d 584. In that case an Egyptian citizen, who was obliged to remain in the United States due to World War II and did not become a resident, was held liable for taxes on profits realized from his trading on his own account on the securities and commodities exchanges. The volume of his trading ran as high as 243 purchases and 60 sales of securities in one year and "was done on margin and required the attention of taxpayer while he was living in this country awaiting the end of the war." (185 F.2d at p. 586.)

*Washburn* v. *Commissioner of Internal Revenue* (8th Cir. 1931) 51 F.2d 949, dealt with another provision of the Internal Revenue Act employing comparable language and which allowed a taxpayer to deduct from general income net loss "resulting from the operation of any trade or business regularly carried on by the taxpayer." The taxpayer was a retired lawyer who had heavily invested in various small, closely held corporations which had been organized by him and to which he devoted his entire time. One of them, a railroad, did not prosper and he sold his stock at a loss. The contentions of the parties were stated as follows (51

F.2d at p. 952): "Respondent contends that petitioner was a mere investor; that the statute is restricted in its application to taxpayers whose income is derived from regular trade with others, such as merchants, manufacturers, and those who have paid taxes on incomes reflected by inventories; that petitioner was not a dealer in securities, but was merely holding securities of corporations and enterprises in which he was interested; that his occupation was guarding his various investments in order to reap a harvest from past sowings; and that the loss was the result of an isolated transaction.

"Petitioner does not claim that he was engaged in the railroad business or that he was a dealer in securities. *His position is that his occupation was the personal attention given to the management of the various enterprises in which he had investments for the purpose of making those enterprises successful and profitable;* that to this he gave his entire time, and was doing a great deal more than merely guarding his investments; that the loss on the sale of the railroad was occasioned in carrying on his general avocation." (Italics added.) Deciding in favor of the taxpayer, the court said (51 F.2d at pp. 953-954): "Much is said in argument as to petitioner being engaged solely in holding the securities of the enterprises in which he was interested, and that he was a mere investor receiving the ordinary returns of ownership. A party may have investments in corporate stock, have no particular occupation, and live on the return of his investments. That would not constitute business under the statute in question. *He may, however, take such an active part in the management of the enterprise in which he has investments as to amount to the carrying on of a business.* In Ames v. Commissioner of Internal Revenue, 49 F.(2d) 853, this court said that an executor might carry on such activities for the purpose of earning profits as would constitute the doing of business. In Bedell v. Commissioner of Internal Revenue (C.C.A.) 30 F.(2d) 622, 624, the court said: 'A trader on an exchange, who makes a living in buying and selling securities or commodities, may be said to carry on a "business"; a person who frequents brokers' offices, and continually dabbles in real estate is conceivably quite different. Most men who have capital change their investments, and may speculate all the time; we should hardly call this a business, though the line is undoubtedly hard to draw.' We think the line here is not difficult to draw. The business of petitioner was not merely looking after investments or reaping the return of past labor represented thereby. He had an office with a complete organization, and gave personal attention to, and participated in, the management of these various companies and enterprises in which he had the investments, not for the purpose of conserving them merely, but of carrying them on

successfully and making them profitable. To this he gave his entire time, receiving no salary, except such as might cover his expenses. His work for these different enterprises was not merely sporadic, but was a continuous and regular carrying on. Petitioner testifies he worked as hard at his new line of work as he did when he was practicing law. His income was the result, not alone of his investments, but also of his labor expended in connection with the management of the companies in which he had such investments. The combination of the two is his vocation.

"Can it be said that the numerous investment bankers, underwriters, manufacturers, promoters, and others, who, having large investments in enterprises, give their time and attention to assisting in the management of such enterprises in order to make them successful, are nothing but investors and not engaged in any business regularly carried on? We think not. Whether petitioner's business, viewing his entire activities, be regarded as a general one involving active participation in the supervision of the various companies in which he was interested, or whether he be regarded as carrying on a number of separate kinds of business, among which was the development of the timber holdings, the loss in question occurred in a business regularly carried on." (Italics added.)

Another federal statute employing the phrase "engaged in business" (§ 14, subd. (c)(3) of the Bankruptcy Law, which authorized the court to refuse a discharge to a bankrupt who had made a materially false statement in writing respecting his financial condition "while engaged in business . . . .") was involved in *Clancy* v. *First National Bank of Colorado Springs* (10th Cir. 1969) 408 F.2d 899. An order of the district court reversing the referee's action granting the bankrupt a discharge was affirmed by the Tenth Circuit. The bankrupt was engaged in trading on his own account on the securities market and he had obtained a loan from a bank by employing a knowingly false financial statement. The court said (408 F.2d at pp. 901-902): "The courts have long struggled with the term 'business' and what is meant by it. It was stated in In re Green's Estate, 109 Misc. 112, 178 N.Y.S. 353, 360 (1919):

" 'How equivocal the noun "business" really is will be readily perceived by trite examples. . . . If I go a-fishing in this state, I am not a-doing business there; but if a fishmonger goes a-fishing to replenish his stall in this city, he is doing business within the Tax Law. It is because of the ambiguity denoted that the courts properly say that the colloquial word "business" if used in statutes is among the most indefinite in the English language.'

"Though concluding that a bankrupt sharecrop farmer was not engaged in 'business' within the purview of amended § 14, sub. c(3), the court in In re Simms, 202 F.Supp. 911 (E.D.Va. 1962), examined the legislative history of the 1960 amendment in its effort to determine the intent of the Congress. The court states at pages 913, 914:

" 'The legislative history draws a clear line of demarcation between one engaged in "business" and one engaged in "non-commercial activities." . . .' "

" 'We turn to what Congress intended by the use of the word "business" in amending § 14 of the Bankruptcy Act. The Committee reports, as suggested, contrast "business" activity with "non-commercial" activity. . . . A fair interpretation of what Congress was attempting to do in amending § 14 and § 17 would lead to the reasonable conclusion that Congress meant to retain under § 14, sub. c(3) that type of business which is mercantile in character—one that is with regularity engaged in buying, selling and trading.' "

"Certainly, the bankrupt was engaged in business when professionally buying and selling stocks. He had no other source of income and no other job. This was his exclusive business. He also was required to keep records for all his transactions because of the tax consequences. It is significant that in the *Simms* case, *supra,* the court uses the bankrupt who is covered by the 1960 amendment as the one 'who would not be excused from keeping and preserving books of account or records under § 14, sub. c(2).' Id. at 914."

The foregoing California and federal authorities indicate that the phrase "engaged in business" is capable of a wide variety of meanings. And, as stated in *Commissioner of Internal Revenue* v. *Nubar, supra,* 185 F.2d at p. 586, its meaning in a given case "is to be determined not in vacuo, but with reference to the purpose for which the statute was passed." Thus, the phrase may be found to encompass almost any activity engaged in for profit with "frequency and continuity" when such interpretation is consistent with the purpose of the statute in which it is embodied.

As employed in section 537.2 of the Code of Civil Procedure, the phrase "engaged in business" is a part of an act to establish an interim attachment remedy (Stats. 1972, ch. 550, hereinafter referred to as the "Act") pending a comprehensive revision of the entire area of creditors'

remedies in this state in light of the decision of our Supreme Court in *Randone* v. *Appellate Department,* 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], which declared unconstitutional all of the California statutes providing for prejudgment attachment. According to its title, the Act was "[a]n act . . . relating to attachment in commercial actions." The provisions designed to implement the Act's concern with "commercial actions" are sections 537.1 and 537.3. ▮ Both the provisions of the Act and its legislative history indicate that its purpose was to restore, on an interim basis, the availability of attachments in commercial actions only and to limit its applicability even in such actions so as to eliminate specific objections voiced in *Randone* to the then existing attachment procedures. The purpose of the Act, which was Senate Bill 1048, is described in Comment, *Attachment in California,* 4 Pacific Law Journal 146, 152, as follows: "The main purpose of Senate Bill 1048 is to restore the attachment remedy in commercial situations in which one business has furnished goods on credit or loaned money to another business.[47]"

The memorandum referred to in footnote 47 in the above quotation is the only legislative history which is available to aid in the construction of the Act. It was submitted along with the initial draft of Senate Bill 1048 and accompanied it through the Legislature. The final form of the bill did not substantially deviate from the initial draft so the arguments stated in the memorandum must have been found persuasive by the Legislature. The memorandum contains a general statement of the purpose and need for the legislation. In describing the decision in *Randone,* the memorandum states: "This decision of the California Supreme Court in *Randone* has created an acute crisis in connection with the collection of obligations in the State of California, particularly with respect to obligations incurred in the course of the operation of all businesses in this State. While the Court in *Randone* was concerned about the plight of a poor consumer in rendering its decision, it considered it necessary to declare the attachment statutes unconstitutional *in toto,* and indicated that it was not the responsibility of the Court to revise the statute so as to save those portions which could constitutionally be applied."

The memorandum continued by explaining the basic philosophy underlying the bill, saying in this respect: "Specifically, the principle upon which S.B. 1048 is based is that commercial cases can and should be dealt with separately from consumer cases and that the prejudgment remedy of attachment, with a modified procedure to meet the specific

---

"[47] See *Memorandum in Support of S.B. 1048* by Harold Marsh, Jr., 1-4. (Mr. Marsh provided the initial draft of S.B. 1048 which was introduced into the Legislature by Senators Zenovich and Coombs)."

objections in *Randone* to the present procedures, should be preserved in those cases where credit is extended to a business."

In a subsequent portion of the "philosophy" section of the memorandum the legislation is said to deal with the "situation involving the loan of money or the furnishing of goods by one business to another, to which the remedy is basically restricted in S.B. 1048." In a detailed analysis of each of the sections of the bill, section 537.2 is discussed in the following terms: "This section provides that the remedy of attachment is available against all business corporations, all partnerships and all individuals engaged in a trade or business. For all practical purposes, this excludes actions based upon the sale of consumer goods."

In light of the above legislative history, the provisions of sections 537.1 and 537.2 disclose the legislative purpose to restore (on an interim basis) the remedy of attachment in actions against resident defendants only for the enforcement of claims "involving the loan of money or the furnishing of goods by one business to another." The objective of such restoration was to permit the continuance of existing credit practices whereby unsecured credit was feasible based upon the creditor's ability to prevent dissipation of the debtor's assets pending trial of an action to collect. Also sought was the elimination of our Supreme Court's objection to the extreme hardship which the use of attachment procedures in consumer cases often entailed.

It is necessary to read sections 537.1 and 537.2 together to discern the mode by which the Act's purpose to restrict attachments to "commercial actions" is implemented. The transactions qualifying under section 537.1 are of a type generally engaged in by businesses. The obligors of the claims generated thereby are not always businesses; hence the requirement that the action be "against a defendant described in subdivision (a), (b) or (c) of section 537.2." Section 537.2, then, deals with the matter solely from the point of view of the status of the defendant, ensuring that it is a "commercial action" by requiring that the defendant be a business corporation, a partnership, or an individual "engaged in a trade or business."

Neither section, however, expressly requires that there be a connection between the business in which the defendant is engaged and the transaction upon which the claim is based. The March 1973 *Tentative Recommendation relating to Prejudgment Attachment of the California Law Revision* Commission notes this omission as follows: "Unfortunate-

ly, the 1972 act does not specifically tie the types of alleged debts which may form the basis for attachment to the business activities of the defendant. Hence, for example, the 1972 act would not permit the attachment of the property of an ordinary resident wage earner in an action based on the furnishing of medical services or the sale of consumer goods to such individual. The act would, however, permit the attachment of the property of an individual doing business as a grocer or self-employed plumber on the same type of debt.[10] This inconsistency should be eliminated. *The Commission recommends that the policy implicit in the 1972 act be continued by authorizing nonjurisdictional attachment only in those cases where the claim is based on an unsecured contract, whether express or implied, and arises out of the conduct by the defendant of a trade, business, or profession."* (Italics added.)

The constitutional question posed can and should be avoided by construing these sections as limiting the attachment to situations in which the claim arises out of defendant's conduct of his business.

So construed, these sections are confined to a subject expressed in the title of the Act. Such a construction also accommodates the hardship objection stated in *Randone.* As the Law Revision Commission's tentative recommendation stated, *supra* at page 522: "The situations where attachment may be authorized are limited by constitutional requirements. A dominant theme of the recent California and federal court decisions in the area of prejudgment remedies is that assets of an individual which are 'necessities of life' are constitutionally entitled to special protection because of the extreme hardship to the individual which results when he is deprived of their use.[7] In its discussion of 'necessities,' the court in *Randone* referred in part to such consumer goods as 'television sets, refrigerators, stoves, sewing machines and furniture of all kinds.'[8] Certainly a partially effective, if indirect, way of preventing

---

"[10]There is a possibility that the 1972 statute is void insofar as it authorizes attachment in consumer—as distinguished from commercial—actions. The title to the 1972 enactment provides that it is one 'relating to attachment in commercial actions.' Section 9 of Article IV of the California Constitution provides in part: 'A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void.' "

"[7]See, *e.g.,* Sniadach v. Family Finance Corp., 395 U.S. 337 (1969); Fuentes v. Shevin, 407 U.S. 67 (1972); McCallop v. Carberry, 1 Cal.3d 903, 464 P.2d 122, 83 Cal.Rptr. 666 (1970); Randone v. Appellate Dep't, 5 Cal.3d 536, 488 P.2d 13, 96 Cal.Rptr. 709 (1971); Blair v. Pitchess, 5 Cal.3d 258, 486 P.2d 1242, 96 Cal.Rptr. 42 (1971).

"[8]5 Cal.3d at 560, 488 P.2d at 29, 96 Cal.Rptr. at 725, quoting from Blair v. Pitchess, 5 Cal.3d 258, 279, 486 P.2d 1242, 1257, 96 Cal.Rptr. 42, 57 (1971)."

attachment of such consumer necessities is to deny the use of the remedy in actions based on obligations generally and to authorize attachment only in actions to recover debts *arising out of the conduct by the defendant of a trade, business, or profession.*" (Italics added.)

This does not mean, however, that the claim sued upon must be based upon a transaction in which the defendant is the primary obligor. If such were the intended meaning, the section could simply have so provided. Subdivision (a) would have read in part: "(a) An action against a defendant described in subdivision (a), (b) or (c) of Section 537.2 for a liquidated sum of money based upon

"(1) Money loaned to said defendant; or

"(2) A negotiable instrument of said defendant; or

"(3) The sale or lease of, or a license to use, real or personal property (including, without limiting the generality of the foregoing, goods sold and delivered on open account) to said defendant; or

"(4) Services rendered to said defendant."

Of course, were the section so worded, it would fall short of achieving its purpose of authorizing attachments "in those cases where the claim is based on an unsecured contract, whether express or implied, and arises out of the conduct by the defendant of a trade, business, or profession." For example, a financier conducting a large scale operation, extending for a fee lines of credit to merchants by guaranteeing their accounts, would be exempt from attachment when sued on any such obligation because no money would have been loaned to him and no goods would have been sold to him. In the absence of express language so providing, it cannot be assumed any such arbitrary classification was intended. Identity between the primary obligor (borrower, maker, buyer or recipient of services) on the one hand, and defendant on the other hand, is therefore a false quantity, having no bearing upon the purpose of this legislation.

Such being the case, respondent court's policy of requiring the establishment of identity between the defendant guarantor and the primary obligor on the basis of the doctrine of *alter ego* is inappropriate and results in it declining to determine the facts which properly govern the determination "whether the case is one in which an attachment is properly issuable."

The proper standard for determining whether a defendant guarantor or accommodation maker is engaged in business so as to make issuable an attachment against him is the application of the general principles

stated in the authorities cited earlier in this opinion, giving due consideration to the purposes of the Act. ■ If the defendant is engaged generally in the business of guaranteeing for a consideration the debts of others, that is, lending credit, any liability incurred as a result is a debt arising out of the conduct of his business. At the opposite extreme, a retired person, with no financial stake in the success of the primary obligor, cannot properly be held engaged in business solely by virtue of an isolated instance in which he guarantees a commercial obligation out of friendship and without compensation.

Cases falling between these extremes will require the exercise of judgment on a case-to-case basis to determine whether the activity of the defendant with respect either (1) to the extension of credit generally, or (2) to the business of the primary obligor is such as to justify the conclusion that the guarantee of the primary obligor's debt sued upon is part and parcel of an activity which occupies the time, attention and effort of the guarantor for the purpose of livelihood or profit on a continuing basis.

In cases involving guarantees by principal shareholders of closely held corporations, consideration will necessarily be given to the degree and continuity of the guarantor's involvement in the affairs of the primary obligor out of which the indebtedness has arisen. For example, (1) if a corporation has habitually been provided with operating capital through the medium of such guarantees by the defendant, or (2) the obligation sued upon has resulted from an extension of credit in reliance upon defendant's continuing guarantee, or (3) the defendant has extensively occupied himself in the management of the primary obligor on a continuing basis and has a major stake in its success, the required "frequency and continuity" may be found to exist. ■ In short, if the sum total of the circumstances justifies the conclusion that the guarantor occupied himself to a substantial degree and on a continuing basis in promoting his own profit through provision of credit or management to the primary obligor, a guarantee executed in the course of such activity may properly be considered an obligation arising out of the conduct of the guarantor's business.

The application of the foregoing standard will effectively foreclose attachments in any of the "consumer" situations which the court found to raise special problems in *Randone*. Situations in which personal hardship may result to individual defendants are adequately dealt with by section 537.3 which allows the defendant to have excluded from the effect of the levy property "which the court finds is necessary for the

support of the defendant and his family after taking into consideration all of his other income and assets not subject to levy or not levied upon." The other constitutional objections relating to the lack of any preattachment hearing to establish probable validity of the claim and the absence of any reasonable probability that a successful defense can be asserted are remedied by section 538.4.

It is apparent that the court's adoption of an erroneous standard for determining the availability of the attachment remedy effectively precluded petitioner from having the issue resolved on the basis of relevant evidence bearing thereon. The matter, therefore, should be reheard by respondent court and determined on the basis of the standards above set forth.

The alternative writ shall, therefore, be discharged and a peremptory writ of mandate shall issue directing respondent court to vacate and set aside its order denying petitioner's application and to grant petitioner a new hearing on said application.

Ford, P. J., and Allport, J., concurred.