POS–A–TRACTION, INC., a California corporation; and Jay Krech, an individual, Plaintiffs,

v.

The KELLY–SPRINGFIELD TIRE COMPANY, a DIVISION OF the GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation; and Does 1 through 20, inclusive, Defendants.

And Related Cross–Action.

No. CV 98–7626–ABC(RCX).

United States District Court, C.D. California.

May 26, 2000.

Philip D. Dapeer, Dapeer & Hirsch, Los Angeles, California, Paul S. Krech, propria persona, Puyallup, WA, for plaintiff/counterdefendant Pos–A–Traction, Inc.

Louis E. Kempinsky, Sam S. Oh, Tuttle & Taylor, Los Angeles, CA, for defendant/counterclaimant Kelly–Springfield Tire Company.

## MEMORANDUM DECISION AND ORDER GRANTING APPLICATION FOR RIGHT TO ATTACH ORDER

CHAPMAN, United States Magistrate Judge.

On April 16, 1999, counterclaimant THE KELLY–SPRINGFIELD TIRE COMPA-

NY filed a Notice of Application for Right to Attach Order and Writs of Attachment; Application for Right to Attach Order and Order for Issuance of Writ of Attachment, with supporting exhibits; and Notice of Motion and Motion for Right to Attach Order and Issuance of Writ of Attachment, with supporting memorandum of points and authorities, declarations of Frank Perry and Sam S. Oh, and exhibits. To secure its counterclaim against counterdefendant Jay Krech ("Krech") in the principal amount of $2,674,550.65, plus estimated costs of $2,500.00 and attorney's fees of $56,761.01, for a total amount of $2,733,-811.66, counterclaimant Kelly seeks the issuance of a right to attach order and writs of attachment against Krech's interests in six parcels of real property. Mr. Krech filed an Opposition to Kelly's application on May 20, 1999. In his opposition, Krech requests a continuance of the hearing on Kelly's application, arguing that his counsel will be out of town from May 14 to June 1, 1999, and that his counsel was misled by Kelly's counsel into believing the hearing date would be continued; however, Krech does not address the merits of the application. On May 21, 1999, Kelly filed a Response to Krech's Opposition, arguing that the continuance should be denied since Kelly would be prejudiced by any continuance unless Krech were prohibited from selling or encumbering the real property during the period of continuance.[1]

Oral argument was held on May 26, 1999, before Magistrate Judge Rosalyn M. Chapman. Counterclaimant Kelly was represented at the hearing by Louis E. Kempinsky and Samuel S. Oh, attorneys at law with Tuttle & Taylor, a law corporation. Counterdefendant Krech was not present at the hearing or represented by counsel. Counterdefendant Paul S. Krech was not present at the hearing or represented by counsel.

## BACKGROUND

On August 21, 1996, Pos–A–Traction, Inc., a California corporation ("PAT") and

---

1. The Court, on May 25, 1999, denied Krech's    request for a continuance.

Jay Krech ("Krech"), an individual, filed a complaint in the Superior Court for the County of Los Angeles against The Kelly–Springfield Tire Company ("Kelly"), a Maryland corporation, and several Does claiming, among other things, breach of contract. On September 21, 1998, the action was removed to the federal court based on diversity of citizenship. Thereafter, on November 16, 1998, plaintiffs filed a First Amended Complaint ("FAC") against Kelly setting forth the following causes of action on behalf of PAT: (1) breach of contract, (2) fraud, (3) negligent misrepresentation, (4) unfair business practices under California Business and Professions Code ("B.P.C.") §§ 17000 et seq., (5) interference with prospective business advantage, (6) unfair competition under B.P.C. §§ 17200 et seq. Additionally, the First Amended Complaint contains a claim for fraud on behalf of Krech and a claim for breach of covenant of good faith on behalf of both plaintiffs.

Common to all causes of action, plaintiffs make the following allegations: Plaintiff PAT is a California corporation that wholesales and distributes automobile and light truck tires, and plaintiff Krech is President and sole shareholder of PAT. FAC, ¶¶ 1, 2, 6. Tires are distributed under PAT's own label, which is a registered trademark; for approximately fourteen years, PAT's name brand tires have been manufactured by Kelly, which also manufactures, distributes and retails tires under its own name. FAC, ¶¶ 6–8. A partially written and partially oral agreement between PAT and Kelly provides that PAT will order all of its name brand tires from Kelly, and Kelly will provide all of PAT's requirements; historically, PAT has ordered approximately $400,000.00 to $600,000.00 tires on a monthly basis and paid for them within 45 to 60 days of invoice. FAC, ¶¶ 9–11. It was not uncommon for PAT to owe Kelly $800,000.00 to $1.2 million at any given time on outstanding invoices. FAC, ¶ 11. Due to an economic slump, PAT's sales decreased in the early 1990's, and PAT's business and cash flow, suffered a setback, culminating in PAT owing Kelly approximately $1 million in past invoices by the end of 1996. FAC, ¶¶ 12–13.

In early 1997, PAT signed a $1 million promissory note to pay off the balance on the invoices, and Kelly agreed to permit PAT to make purchases of additional tires; the $1 million promissory note was paid in full as of May 1998. FAC, ¶ 14. In addition, Kelly urged PAT to increase its customer base, and advised PAT that if it failed to do so it might have to cancel some of its tire lines because the lines were insufficient. FAC, ¶ 15. Toward this end, Kelly promised to assist PAT to increase its sales volume; however, Kelly did not perform as promised although, in reliance on Kelly's promise, PAT took various steps, including opening new warehouses, relocating tire inventory, and placing new orders with an expectation they would be filled. FAC, ¶¶ 16–17. In late spring 1997, Kelly accepted orders from PAT as usual; however, Kelly failed to deliver approximately 50 percent of the tires ordered, which PAT, upon information and belief, alleges was due to Kelly's determination to revamp its production line. FAC, ¶¶ 18–20. As the result, PAT was unable to fulfill orders from its customers and lost many customers and substantial good will. FAC, ¶¶ 21–22. Due to the decline in Kelly's ability to meet PAT's orders, the unpaid balance on the open account owed by PAT to Kelly increased to approximately $2.6 million as of the spring of 1998. FAC, ¶¶ 23–26. As the balance on the open account increased, Kelly refused to continue delivering tires on the 45–60 day terms previously extended and instead demanded that orders be paid in the month they were drawn from inventory. FAC ¶ 27. Beginning in June 1998, Kelly demanded PAT pay $80,000.00 immediately or PAT would not be allowed to obtain tires from Kelly. FAC, ¶¶ 28–31.

The plaintiffs pray for compensatory damages, for punitive damages on the sec-

ond, third and seventh causes of action, for statutory damages on the sixth cause of action, and for reasonable attorney's fees and costs.

On December 9, 1998, Kelly answered the First Amended Complaint, raised thirteen affirmative defenses and filed a counterclaim against PAT, Krech and Paul S. Krech. In the counterclaim, Kelly sets forth three claims for relief against PAT: (1) breach of contract, (2) open book account, and (3) goods sold and delivered. Additionally, Kelly raises claims against Krech and Paul Krech based on breach of guaranty. Kelly prays for judgment against PAT, Krech and Paul Krech in amounts ranging from $2,657,379.57 to $2,674,674.09, plus attorney's fees, and costs. Common to these claims, Kelly alleges that on March 1, 1991, Krech executed and delivered to Kelly a Guaranty in which Krech personally and unconditionally, albeit without collateral, guaranteed the payment of all of PAT's debts to Kelly. Counterclaim, ¶ 6. In reliance on Krech's Guaranty, on or about November 1991, Kelly entered into a purchase agreement with PAT in which Kelly agreed to sell tires to PAT based on invoices from Kelly. Counterclaim, ¶ 8. Thereafter, Kelly sold tires to PAT on an open book account, which currently has an unpaid balance of $2,674,674.09, no part of which has been paid to Kelly. Counterclaim, ¶ 9. On November 20, 1998, Kelly demanded that Krech pay the past due balance owed by PAT under the Guaranty; however, Krech did not comply. Counterclaim, ¶ 10. Kelly makes similar allegations against counterdefendant Paul Krech, who is alleged to have also entered into a Guaranty of PAT's open book account with Kelly. Counterclaim, ¶¶ 5, 7, 11.

On December 21, 1998, PAT and Krech answered the counterclaim. On April 20, 1999, Paul Krech answered the counterclaim.

## DISCUSSION

■ Federal Rule of Civil Procedure 64 provides that:

At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to [certain] qualifications.... The remedies thus available include ... attachment....

The effect of Rule 64 is to incorporate state law to determine the availability of prejudgment remedies for the seizure of property to secure satisfaction of a judgment ultimately entered. *Granny Goose Foods Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Co.*, 415 U.S. 423, 436 n. 10, 94 S.Ct. 1113, 1123 n. 10, 39 L.Ed.2d 435 (1974).

■ The burden is on the moving party to establish grounds for an order of attachment. *Loeb and Loeb v. Beverly Glen Music, Inc.*, 166 Cal.App.3d 1110, 1116, 212 Cal.Rptr. 830 (1985); *see also* Legislative Committee Comment to 1974 Addition to C.C.P. § 484.090 (stating that the "plaintiff has the burden of proving (1) that his claim is one upon which an attachment may be issued, and (2) the probable validity of such claim."). Attachment is a purely statutory remedy, which is subject to strict construction. *Jordan–Lyon Productions, Ltd. v. Cineplex Odeon Corp.*, 29 Cal.App.4th 1459, 1466, 35 Cal.Rptr.2d 200 (1994).

■ In California, the procedures and grounds for obtaining orders permitting prejudgment writs of attachment are governed by Code of Civil Procedure (C.C.P.) Sections 481.010 et seq. Generally, an order of attachment may be issued only in an action for a claim of money which is based upon an express or implied contract where the total amount of such claim is a fixed or

"readily ascertainable" amount not less than $500.00. C.C.P. § 483.010(a). When the claim is against a defendant (or counterdefendant) who is a natural person, an attachment may be issued only on a claim which arises out of the conduct by the defendant (or counterdefendant) of a trade, business, or profession, and only if the goods, services, or money furnished were not used by the defendant (or counterdefendant) primarily for personal, family or household purposes. C.C.P. § 483.010(c). Attachment may issue against an individual who guarantees corporate obligations or business debts if "the guarantee ... sued upon is part and parcel of an activity which occupies the time, attention and effort of the guarantor for the purpose of livelihood or profit on a continuing basis." *Advance Transformer Co. v. Superior Court of Los Angeles County*, 44 Cal.App.3d 127, 144, 118 Cal. Rptr. 350 (1974).

California Code of Civil Procedure § 484.090 provides that before an attachment order is issued, the Court must find all of the following: (1) The claim upon which the attachment is based is one upon which an attachment may be issued; (2) the applicant has established "the probable validity" of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the request for attachment is based; and (4) the amount to be secured by the attachment is greater than zero. In order to establish the "probable validity" prong of the attachment statute, the applicant must show that it is more likely than not it will obtain a judgment against the defendant (or counterdefendant) on its claim. C.C.P. § 481.190.

The application for a right to attach order must be supported by an affidavit or declaration showing that the applicant, on the facts presented, would be entitled to a judgment on the claim upon which the attachment is based. C.C.P. § 484.030. The affidavit or declaration must state the facts "with particularity." C.C.P. § 482.040. Except where matters are specifically permitted to be shown upon information and belief, each affidavit or declaration must show that the affiant or declarant, if sworn as a witness, can testify competently to the facts stated therein. *Id.* At a minimum, this means that the affiant or declarant must show actual, personal knowledge of the relevant facts, rather than the ultimate facts commonly found in pleadings, and such evidence must be admissible and not objectionable. Calif.Evid.C. § 702; Local Rule 7.5.3.

All documentary evidence, including contracts and canceled checks, must be presented in admissible form, generally requiring proper identification and authentication, and admissibility as nonhearsay evidence or under one or more of the exceptions to the hearsay rule, such as the business records exception. Ahart, *California Practice Guide: Enforcing Judgments and Debts*, ¶¶ 4:145–4:156 (1998 rev.). Regarding authentication, evidence should be presented to prove the genuineness of the signatures or a declaration from the custodian of records laying a foundation for the admissibility. Calif.Evid.C. §§ 1400–1421; Fed.R.Evid. 901–902. For business records, and to show trustworthiness, evidence should be presented to establish that the record was made in the regular course of business, at or near the time of the act or event, and the custodian of records or other qualified witness must identify the record and its mode of preparation, as well as the sources of information and method and time of preparation. Calif.Evid.C. § 1271; Fed.R.Evid. § 803(6).

■ A prejudgment attachment may secure the amount of the claimed indebtedness, as well as estimated costs and allowable attorney's fees. C.C.P. § 482.110(b). However, the amount to be secured by an attachment shall be reduced or offset by the "amount of any indebtedness of the plaintiff [or counterclaimant] that the de-

fendant [or counterdefendant] has claimed in a cross-complaint [or the original complaint] filed in the action if the defendant's [or counterdefendant's] claim is one upon which an attachment could be issued." C.C.P. § 483.015(b)(2). "[T]o sustain reduction in a writ amount, most courts require that the defendant [or counterdefendant] provide enough evidence about its counterclaims [or claims] and/or defenses to prove a prima facie case." Ahart, *California Practice Guide: Enforcing Judgments and Debts,* ¶ 4:64 (1998 rev.); *see also* Law Revision Commission Comments to 1983 Amendment to C.C.P. § 483.015. Furthermore, since an offset claim must be "one upon which an attachment could be issued," it must meet the requirements of C.C.P. § 484.090(a), discussed above.

■ Where the defendant (or counterdefendant) is a natural person, interests in real property except leasehold estates with unexpired terms of less than one year are subject to attachment. C.C.P. § 487.010(c)(1). "[R]eal property may be attached *whether or not it is business related* ... [since r]eal property levies do not deprive a defendant [or counterdefendant] of the continued use of such property...." Ahart, *California Practice Guide: Enforcing Judgments and Debts,* ¶ 4:82 (1998 rev.) (emphasis in original).[2]

■ The Court finds that counterclaimant Kelly's application for a writ of attachment should be granted. First, Kelly has shown that the claim is one upon which an attachment may be issued in that it is a claim for money based on an express, unsecured, commercial contract where the total amount is "readily ascertainable." The declaration of Frank Perry, Kelly's Region Finance Manager, establishes Perry as an "other qualified witness" who is familiar with the methods and procedures used by Kelly to compile and maintain business records, within the meaning of

California Evidence Code 1271(c). As such, Perry can authenticate the exhibits attached to his declaration, including the Guaranty signed by Krech on March 1, 1991. Perry Declaration ("Decl.") ¶¶ 1–4.

Under the terms of the Guaranty, which was entered into "[i]n order to induce [Kelly] to grant credit to [PAT]," Krech "unconditionally guarantee[d] to KELLY the due and punctual payment of all debts, obligations and liabilities of any nature of [PAT] to KELLY...." Perry Decl., Exh. A at ¶ 1. Also, Krech "agree[d] to pay to KELLY reasonable attorneys' fees and all other costs and expenses incurred by KELLY in the enforcement of this Guaranty." *Id.* at ¶ 13; *see also* ¶ 1. Further, in the Guaranty, Krech "waive[d] the right to require KELLY to institute suit against [PAT] ... and agree[d] that KELLY may institute suit against [Krech] without taking any action against [PAT] ... and without proceeding or realizing upon any collateral [PAT] may hold ... [and] further waive[d] any ... defense of [PAT's] ...." *Id.* at ¶ 10.

Thereafter, on or about November 1991, PAT and Kelly entered into an agreement under which Kelly agreed to sell, and PAT agreed to buy, tires for PAT's wholesale and distribution business. Perry Decl., ¶ 5, Exh. B. "[B]y the end of 1996, PAT owed Kelly[ ] approximately $1 million in past due invoices." Perry Decl., ¶ 6. PAT and Kelly, through Perry, attempted to negotiate the resolution of PAT's outstanding obligations, and as a result of such negotiations, PAT executed a promissory note for $1 million, "based upon Krech's assurance that PAT would ... pay[ ] for its current orders in a timely fashion." Perry Decl., ¶¶ 7–8. However, PAT continued to default on its obligations to Kelly, and the past due balance on PAT's account totals $2,674,550.65. Perry Decl., ¶¶ 9–10, Exh. D. On November 20, 1998,

2. Kelly seeks to attach real property owned by Krech, and has reproduced several grant deeds on parcels of real property in Krech's name; however, without tax bills or title reports on these parcels of real property, the Court is unable to determine whether Krech currently holds any interest in these properties or the amount of his interest.

Perry wrote Krech demanding payment of PAT's past due obligations under the Guaranty; however, Krech failed to comply with Kelly's demand. Perry Decl., ¶ 11, Exh. E. Thus, as established by Kelly's business records, the amount Krech has guaranteed is $2,674.550.65. Further, Krech simply cannot establish an offset claim since the contract claim he sets forth in the First Amended Complaint is not "readily ascertainable," *see, e.g.,* FAC ¶¶ 38, 74, and he has not shown the "probable validity" of success on any offset claim.

Second, based on Perry's declaration and Kelly's business records, and for the same reasons discussed above, Kelly has shown the probable validity of the claim in that it is more likely than not that Kelly will obtain a judgment against Krech on the Guaranty counterclaim. *See Bank of America v. Salinas Nissan, Inc.,* 207 Cal. App.3d 260, 273–74, 254 Cal.Rptr. 748 (1989) (partially affirming attachment of guarantor's property based on affidavit demonstrating probable validity); *Lorber Indus. of California v. Turbulence, Inc.,* 175 Cal.App.3d 532, 536, 221 Cal.Rptr. 233 (1985) (affirming trial court's conclusion that manufacturer had established probable validity of its claim under attachment law based on declaration of manufacturer's president together with supporting business records, which "proved the dates, amounts, place of delivery and type of merchandise delivered.").

Since at least February 28, 1991, Krech has held himself out as the President of PAT. Perry Decl., ¶ 12, Exh. F. In fact, Krech alleges in the First Amended Complaint that he is the President and the sole shareholder of PAT. FAC ¶ 2. Furthermore, Krech's general allegations in the First Amended Complaint, as well as Perry's declaration and Kelly's business records, show that Krech was actively involved in PAT's dealings with Kelly and

that the relationship between PAT and Kelly was solely a business or commercial relationship in which Kelly sold tires or goods to PAT, for which Krech guaranteed the payment in the Guaranty, and those tires or goods were not used by Krech for family, household or personal purposes.

Third, there is nothing in the record to suggest that Kelly, in filing the instant Application for Right to Attach Order, has any purpose other than the recovery on the claim upon which the attachment is based.

■■ California Civil Code § 1717 provides that attorney's fees are allowable when provided for in a contract. As discussed above, the Guaranty signed by Krech provides for attorney's fees. The declaration of Sam S. Oh, Kelly's attorney, establishes that the Los Angeles County Superior Court, through Local Rule 3.2, has adopted a schedule for attorney's fees in uncontested and contested matters. Oh Declaration ("Decl.") ¶¶ 1–2. Pursuant to that schedule, Kelly would be entitled to recover attorney's fees of $5,270.00 plus 2% of the amount of the judgment in excess of $100,000.00, unless otherwise determined by the court. Oh Decl., Exh. G.[3] Based upon Kelly's claim against Krech in the amount of $2,674.550.65, Kelly would be entitled to recover attorney's fees in the amount of $56,761.01. Oh Decl. ¶ 2. Moreover, the actual attorney's fees in this matter, if it proceeds to trial, will be substantially in excess of this amount. *Id.* Mr. Oh, through his declaration, also establishes recoverable costs in the amount of $2,500.00. *Id.* at ¶ 3.

### ORDER

The application of counterclaimant The Kelly–Springfield Tire Company for a right to attach order against counterdefen-

---

**3.** Pursuant to Fed.R.Evid. 201, this Court takes judicial notice of Los Angeles County Superior Court's Local Rule 3.2.

dant Jay Krech, an individual, IS GRANTED in the amount of $2,733,811.66.