[Civ. No. 44223. Second Dist.. Div. Five. Oct. 24, 1975.]

DAVID GILL, Plaintiff and Respondent, v.
ENRIQUE SORT DE SANZ et al., Defendants and Appellants.

[Civ. No. 44787. Second Dist., Div. Five. Oct. 24, 1975.]

DAVID GILL, Plaintiff, Cross-defendant and Appellant, v.
ENRIQUE SORT DE SANZ et al., Defendants, Cross-complainants and
Respondents.

**COUNSEL**

Manatt, Phelps & Rothenberg, John Gaims, Terry S. Kaplan, Alan Jay Weil and Sanford Alan Rosen for Plaintiff and Respondent and for Plaintiff, Cross-defendant and Appellant.

Erwin I. Grant for Defendants and Appellants and for Defendants, Cross-complainants and Respondents.

**OPINION**

**KAUS, P. J.**—These consolidated appeals involve the attachment of California assets of three Mexican corporations, not qualified to do business in California, who are among the defendants below. In 2d Civil No. 44223, the corporations appeal from a trial court order refusing to release and discharge an attachment before they had made a general appearance in the action. In 2d Civil No. 44787, plaintiff appeals from a trial court order granting such a motion after the defendants' general appearance.[1]

---

[1]It might be suggested that defendants' appeal from the earlier order is moot, since the later order from which plaintiff appeals granted defendants the relief that was originally

## FACTS[2]

Before the present action was filed, plaintiff Gill was appointed receiver of Ti-Cal Contracting & Manufacturing Co., Inc., a California corporation, d/b/a Jess Contracting & Manufacturing Sewing Service ("Jess"). According to plaintiff, his appointment was triggered by charges in a shareholders' action that one de Sanz—the alleged villain in this piece—as president of Jess intentionally mismanaged the corporation and misappropriated and misused funds belonging to Jess. Gill then filed the present action. De Sanz, a California resident, and the three Mexican corporations—Cali-Mod, S.A., Ropa-Paty, S.A. and Baja Texport, S.A.—were named as defendants. The gist of Gill's case is simply this: Jess had been engaged as a broker or middleman for transportation of raw materials from the United States to Mexico, where these materials were turned into finished goods and returned to the United States for delivery. The three Mexican corporations, pursuant to agreement with Jess, had undertaken and did perform services in producing the finished goods. De Sanz was the president of Jess and a majority shareholder in each of the Mexican corporations, who are alleged to be his *alter ego* for all the usual reasons. Somehow or other, by reason of de Sanz' misuse of his office with Jess, the three Mexican corporations wound up "owing" Jess about $64,000, $12,000 and $3,000, respectively. According to a declaration filed by plaintiff "these sums were owed to JESS for *overpayments* made to these corporations for labor and services *previously* rendered by them to JESS." (Italics added.) $16,000 of the money owed to Jess by defendant Cali-Mod was paid to that corporation by plaintiff himself shortly after his appointment as receiver, because de Sanz fraudulently represented that Jess actually owed Cali-Mod $26,000.

These basic facts are alleged against de Sanz and the three Mexican corporations in eight causes of action, three of which are common counts

denied. Defendants, however, apparently envision a future claim for wrongful attachment and urge us to consider their appeal on the merits. As will be seen, it is quite unmeritorious and not worth more than a footnote. (See fn. 12, *infra*.) Realistically, the only appellant before us is plaintiff.

[2]As plaintiff, on his appeal points out, the legality of the attachment must be determined from the entire record in the attachment suit. (*Stowe* v. *Matson,* 94 Cal.App.2d 678, 682 [211 P.2d 591].) "The question is not what the plaintiff has pleaded but what in truth and in fact is [his] grievance." (*San Francisco Iron etc. Co.* v. *Abraham,* 211 Cal. 552, 554 [296 P. 82].) In determining the true nature of plaintiff's action, we are, therefore, not bound by the four corners of the complaint. To be specific, in addition to the complaint we consider a declaration by plaintiff himself filed in opposition to defendants' motion to set aside the attachment.

for money had and received in the noted amounts of about $64,000, $12,000 and $3,000. It is these common counts on which plaintiff mainly relies to secure a reversal of the order releasing the attachment.

The complaint was filed on October 16, 1973. On October 17, plaintiff procured the ex parte issuance of writs of attachments against "all corporate property in California" of each of the defendant corporations. The record does not show what assets were attached. On November 9, 1973, the corporations moved to release and discharge the attachments on the sole ground that the complaint alleged that de Sanz, a California resident, was the *alter ego* of the corporation. That motion was denied on November 23 and it is from that denial that defendants appeal in 2d Civil No. 44223. Thereafter, on December 11, 1973, defendants made a general appearance in the action by filing an answer. They then again moved to "release and discharge" the attachments. That motion was eventually granted on February 11, 1974. That order is the basis of plaintiff's appeal in 2d Civil No. 44787.

## DISCUSSION

Although, as will be seen, the question before us is simply whether plaintiff's action will support an attachment against a resident defendant, we must consider that narrow issue in the context of the entire so-called "interim" attachment law enacted by the California Legislature in 1972 (Stats. 1972, ch. 550) in the wake of the Supreme Court's decision in *Randone* v. *Appellate Department,* 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], invalidating former section 537, subdivision 1, of the Code of Civil Procedure.[3]

Interpreting the reach of the United States Supreme Court's decision in *Sniadach* v. *Family Finance Corp.;* 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820], the Supreme Court, in *Randone,* held specifically: (1) Former section 537, subdivision 1, was unconstitutional in that it permitted an alleged debtor to be deprived of a significant interest in the property attached, without a hearing and without requiring a showing of "extraordinary circumstances" which might justify an ex parte attachment; (2) the subdivision was also unconstitutional because it permitted the attachment of a debtor's "necessities of life" without a prior hearing—a due process imperative with regard to such necessities even in "extraordinary situations;" and (3) that while the Legislature was

---

[3]All statutory references, unless otherwise indicated, are to the Code of Civil Procedure.

undoubtedly capable of drafting a valid prejudgment attachment statute, the court itself could not "properly undertake the wholesale redrafting" (*id.* at p. 563) of section 537, subdivision 1, so that it could be used in situations in which it would not run afoul of the due process clause.

In effect, then, after *Randone,* California had no attachment statute for any contingency covered by former subdivision 1 of section 537.

The Legislature reacted to this void in two ways: less than a full year after *Randone,* it enacted the interim attachment statute, with which we are now concerned. At that time, it had already directed the California Law Revision Commission (Stats. 1972, ch. 27) to study the law relating to attachment and related matters. The commission's recommendation relating to prejudgment attachment was submitted to the Legislature on December 3, 1973, and was, in the main, adopted during the following year.[4] (Stats. 1974, ch. 1516.)[5] By their own terms, the interim legislation was to expire on December 31, 1975, and the new attachment statute was to take effect the next day. Within the last few weeks, however, the Legislature has extended the life of the interim legislation by one full year, to December 31, 1976, and, concomitantly, postponed the birthday of the new attachment statute. (Stats. 1975, ch. 200.) Since then the California Law Revision Commission has circulated about 30 tentative recommendations for changes to the 1974 legislation. The sole significance of all this for present purposes is that the 1974 law is of little significance for the purpose of interpreting the 1972 interim law.[6]

*The interim legislation:*

The interim legislation must be interpreted in the light of three problems faced by the 1972 Legislature: first, without some kind of legislative action, California was left without an attachment statute for contingencies to which subdivision 1 of section 537 had applied: essentially, unsecured "contracts" by California residents; second, other subdivisions of section 537 had also been found constitutionally want-

---

[1]The commission's final recommendation appears in 11 Cal. Law Revision Com. 711.

[5]The 1974 attachment law is far more extensive than the 1972 interim law. It affects several codes, apart from the Code of Civil Procedure. In the latter code, it starts with a new section 481.010.

[6]To be specific: section 483.010 of the 1974 law appears to be broader than the 1972 law as far as the availability of attachment on unsecured contract debts against resident defendants is concerned. In part, the language of section 483.010 is reminiscent of former subdivision 1 of section 537, held unconstitutional in *Randone.*

ing;[7] and, third, since the Supreme Court in *Randone* had shown no inclination to reduce an overbroad attachment statute down to constitutional size, the interim statute had to be constitutionally impregnable, or else creditors who, in the Legislature's judgment, should have the protection of prejudgment attachment would be right back where they were after *Randone*.

Finally, it must be noted that in drafting the 1972 interim legislation, the Legislature was faced with a new factor which had to weigh heavily in favor of restricting the availability of attachment: the necessity of providing the machinery for a hearing before the writ could issue. Thus, under section 538.4 of the interim legislation, the writ may not issue unless "the court finds on the basis of a preponderance of the evidence that grounds for the issuance of an attachment exist and that the plaintiff has established the probable validity of his claim and the absence of any reasonable probability that a successful defense can be asserted by the defendant, . . ." The necessity of preceding the issuance of an attachment by a mini-trial obviously adds additional burdens to an already overtaxed judicial system. The more complicated the type of claim in which attachments are authorized, the heavier that burden was bound to become.

It has already been judicially noted that the only extant extrinsic aid in interpreting the interim law is a Memorandum in Support of S.B. 1048, by Harold Marsh, Jr., who provided the initial draft of the 1972 legislation. (*Advance Transformer Co.* v. *Superior Court,* 44 Cal.App.3d 127, 140 [118 Cal.Rptr. 350].) In view of the difficulty in locating this aid in interpreting our present attachment statute—which, as noted, will be with us longer than was anticipated in 1972—we reproduce it in full as an appendix to this opinion.

■ For the purpose of resolving the issues in this case, we have found the memorandum most helpful, for it confirms what the carefully chosen language of the interim law implies: that the 1972 Legislature had no intention of making attachment available in all cases emanating from commercial—as distinguished from consumer—transactions; rather, as far as resident debtors are concerned—that is, cases where the attachment is not used to obtain quasi in rem jurisdiction—the remedy

---

[7]*People* ex rel. *Younger* v. *Allstate Leasing Corp.,* 24 Cal.App.3d 973, 976 [101 Cal.Rptr. 470] (subd. 5 invalid); *Damazo* v. *MacIntyre,* 26 Cal.App.3d 18, 24 [102 Cal.Rptr. 609] (subd. 4 invalid); but see *Damazo* v. *MacIntyre, supra* (old subds. 2, 3 and 6 valid); *Property Research Financial Corp.* v. *Superior Court,* 23 Cal.App.3d 413, 421 [100 Cal.Rptr. 233] (subd. 2 valid).

was intended largely for routine commercial "collection" cases—the kind of debt for which businessmen send each other bills before they sue.

We have discussed the background to the 1972 legislation at such length in order to disprove the underlying assumption of plaintiff's position: that, since his claims against the defendant corporations arose from a commercial, as distinguished from a consumer context, since only corporate assets rather than necessities of life were attached and since under the interim law defendants could have demanded a hearing on the probable merits of plaintiff's claim, a denial of defendants' motion to dissolve the ex parte attachment would not have violated due process as explicated in *Sniadach* and *Randone*. That position would have merit only if we could conclude that the 1972 interim intended to authorize every type of attachment that due process does not forbid; since, however, the goal of the legislation was far narrower, the thrust of plaintiff's position is necessarily undermined.

The Legislature's objective was sought to be achieved in several ways, chiefly:[8] (1) by restricting the availability of attachment against resident defendants to certain very specifically defined types of unsecured claims;[9] (2) by requiring that such resident defendants be, broadly speaking, "in business"; (3) by restricting the type of assets subject to attachment to business assets; (4) by providing an elaborate procedure pursuant to which—in ordinary cases—the defendant was given an opportunity for a hearing before the actual seizure of his assets; and (5) by severely restricting the instances in which the defendant's assets could be levied upon without a hearing.

As far as nonresident defendants are concerned, the type of claim on which an attachment could issue is much broader.[10] Further, the interim legislation provides that in the case of a nonresident defendant, the attachment can issue without a hearing. If, however, the nonresident

---

[8] In view of the appendix we will not burden this opinion by extensive citations to and quotations from the extremely complex provisions of the interim attachment law. Another detailed overview of the act may be found in a comment: *Attachment in California* (1973) 4 Pacific L.J. 146, 152-159.

[9] As will be seen, plaintiff's appeal boils down to the question whether his claim is one of the specifically defined actions on which attachment against resident defendants is permissible.

[10] Section 537.1, subdivision (b), only requires that the action against a nonresident defendant be "for the recovery of money." The obvious purpose of this provision is to confer on California courts quasi in rem jurisdiction in cases where personal jurisdiction cannot be obtained. For the purpose of the interim attachment law, foreign corporations, such as defendants, who have not qualified to do business in California, are treated as nonresidents. (§ 537.2, subd. (d).)

defendant files a general appearance, he is entitled to have the writ of attachment "released and discharged" unless the case is one in which an attachment would issue against a resident. (§ 538.5.)[11]

■ We have gone over this statutory background rather quickly, since the parties agree that the sole issue before us is whether plaintiff's action is one in which an attachment is authorized against a resident defendant on an unsecured obligation. In other words, defendants do not claim that plaintiff attached property which may not be attached or that they are not "in business."[12]

Plaintiff, on the other hand, concedes that his appeal rests on the proposition that his action against defendant is one defined in interim section 537.1, subdivision (a). More particularly, he asserts that he is suing on a contract for "money loaned" or "services rendered," two of

---

[11]Section 538.5 provides in relevant part:

"Notwithstanding the provisions of Sections 538 to 538.4, inclusive, the court shall, upon application by the plaintiff, direct the immediate issuance of a writ of attachment without any notice of hearing (or, under subdivision (c) below, without any hearing) if any one or more of the following conditions exist: . . . .

"(d) The defendant is one described in subdivision (d) of Section 537.2, such writ shall be issued upon the filing of the application provided for in Section 538. A writ of attachment (1) which is issued under this subdivision and levied upon property of a defendant described in subdivision (d) of Section 537.2 but who is not described in subdivision (a), (b) or (c) of Section 537.2, or (2) which is issued under this subdivision based upon a claim which is not described in subdivision (a) of Section 537.1, shall be released and discharged by the court upon motion of the defendant if the defendant files a general appearance in the action. If a writ of attachment is issued under this subdivision and levied upon property of a defendant who is described in subdivision (a), (b) or (c) of Section 537.2 based upon a claim described in subdivision (a) of Section 537.1, the defendant may at any time after such levy, upon seven business days' notice to the plaintiff, request a hearing pursuant to Section 538.4. At such hearing, unless the court makes the findings required by that section for the issuance of a writ of attachment, it shall release and discharge the writ."

In short, if the nonresident defendant files a general appearance and seeks to have the attachment vacated, but it appears that the action is one in which an attachment against a resident would be proper, the nonresident may then demand and receive precisely the same type of hearing on the probable merits of the action as a resident defendant would receive before a writ of attachment is ever issued.

[12]Defendants do contend on their appeal—2d Civil No. 44223—that the ex parte attachment did not properly issue and that, therefore, they were entitled to have it vacated even before they made a general appearance. The point has no merit whatever, and we might as well dispose of it right here. Defendants contend nothing less than that the court should not have considered them as nonresidents because the complaint alleged that they were the *alter ego* of de Sanz, a resident. In effect, they claim, that if a plaintiff alleges that a corporation is the *alter ego* of an individual, he thereby makes a binding election not to proceed against the assets of the corporate defendant, even if he secures a judgment against it and the corporation has assets to satisfy the judgment. Expectably, no authority for that extraordinary contention is cited.

the four specific types of contracts covered by section 537.1, subdivision (a). Since what he is really suing for is a series of overcharges for work that was never performed and $16,000 obtained on a fraudulent representation that Jess owed more than that sum to one of the defendants, his position is obviously precarious.

Former section 537, subdivision 1, in allowing attachments in actions "upon [an unsecured] contract, express or implied, for the direct payment of money, . . ." contained no restriction as to the type of contract; indeed, as interpreted, it required no underlying contract at all: attachment became available in those situations in which the law traditionally had permitted the aggrieved party to "waive the tort and sue in *assumpsit*" on the theory that the law would imply a fictitious promise where, in equity and conscience, the defendant should have made a real one. Thus, under the former statute, attachment was allowed in cases where the gravamen of the plaintiff's complaint was embezzlement (*Hill* v. *Superior Court,* 16 Cal.2d 527, 530-531 [106 P.2d 876]), the conversion of personal property (*Bank of America N. T. & S. Assn.* v. *Hill,* 9 Cal.2d 495, 499-500 [71 P.2d 258]; *Los Angeles Drug Co.* v. *Superior Court,* 8 Cal.2d 71, 74-75 [63 P.2d 1124]), secret kickbacks and profits by the general manager of a corporation (*Arcturus Mfg. Corp.* v. *Rork,* 198 Cal.App.2d 208, 213 [17 Cal.Rptr. 758]) or fraud (*Klein* v. *Benaron,* 247 Cal.App.2d 607, 610 [56 Cal.Rptr. 5]). It is noted that this fictitious promise "for the direct payment of money" rested—in some of the cited situations—on a double fiction: that the defendant not only promised to make restitution for his wrong—say, the theft of a horse—but did so in terms of money! (Cf. *Allen* v. *Merchants Elec. Co. Inc.,* 54 Cal.2d 67, 69 [4 Cal.Rptr. 527, 351 P.2d 799].)

Even where there was a contract for the payment of money, the cases read the word "direct" pretty much out of the statute. The plaintiff did not have to show that the damages were liquidated (*Hale Bros.* v. *Milliken,* 142 Cal. 134, 140 [75 P. 653]); it was only necessary that they be "readily ascertainable by reference to the contract and the basis of the computation of damages appears to be reasonable and definite." (*Force* v. *Hart,* 205 Cal. 670, 673 [272 P. 583].)

In contrast, interim section 537.1, subdivision (a), specifies in relevant part that against resident defendants attachment is permissible only in actions "for [an unsecured] *liquidated* sum of money based upon (1) Money loaned; or (2) A negotiable instrument; or (3) The sale or lease of, or a license to use, real or personal property (including, without

limiting the generality of the foregoing, goods sold and delivered on open account); or (4) Services rendered, . . . " (Italics added.)

Plaintiff would have us ignore this clear intent of the Legislature to confine the availability of attachment against resident defendants to four specific types of transactions and to hold that the quoted language embraces the entire field of nonconsumer dealings. In support, he cites a general statement of the California Law Revision Commission (11 Cal. Law Revision Com. Rep. pp. 701, 723) to the effect that the 1972 legislation attempted to comply with the mandate of *Randone* by restricting "the availability of attachment to commercial situations by generally permitting attachment only against persons or organizations engaged in commercial activities." That statement is, of course, quite true, but it simply does not say what plaintiff reads into it: that the 1972 act permitted attachment in *all* commercial situations, whether enumerated in section 537.1, subdivision (a), or not. If the Legislature had truly intended to occupy the entire field of commercial transactions, it would hardly have gone to the trouble to specify precisely four types—loans of money, negotiable instruments, sales or leases of property, and the rendering of services.

Plaintiff also casts a wistful glance backward at the cases which interpreted subdivision 1 of former section 537 to permit attachments in situations where the plaintiff was able to frame his grievance in the form of a common count based upon a fictitious promise. In this fashion, he seeks to justify the attachments on his three counts for money had and received, arguing that the money wrongfully pocketed by defendants for overcharges was money loaned because of the implied in law agreement to make restitution. We cannot agree. If anything is clear, it is that by dropping the former section's reference to contracts "express or implied" the 1972 Legislature intended to abandon the legal fictions that had been engrafted onto the former statute.[13]

Returning from the land of legal fiction to reality, what Jess did was not to "loan" defendants money, but to pay them sums which mistakenly or fraudulently it was led to believe it owed.

---

[13] Plaintiff argues vigorously that *Advance Transformer Co.* v. *Superior Court, supra,* 44 Cal.App.3d 127, 140, supports his position that section 537.1, subdivision (a), was meant to include all unsecured contracts "whether express or implied." This argument is based on a casual reference to the Law Revision Commission's recommendation which was the basis for the 1974 legislation, made during the court's discussion of an issue quite different from the one involved in this case: under what circumstances the guarantor of a negotiable instrument qualifies as an "attachable" defendant under section 537.2, subdivision (a).

Plaintiff also claims that he is entitled to attach because under subdivision (a)(4) of section 537.1, his action is "based upon . . . services rendered." He asserts that by using the words "based upon" rather than the word "for" the Legislature intended to say that services need not be the consideration furnished by plaintiff, but that services need only be the background out of which the action arises, even if it was the defendant who had done the serving. We find such a strained interpretation quite unacceptable. In any event, as noted, it was not services rendered by defendants which triggered the complaint, but rather services not rendered for which Jess paid.

Finally, plaintiff argues that the order from which he appeals "creates the anomalous situation in which the [nonresident] defendant is entitled to a discharge merely by making a general appearance under section 538.5(d) but not entitled to discharge if the plaintiff proceeds under section 537.1(b) with notice of hearing."

The premise of plaintiff's point—that section 537.1, subdivision (b), permitting attachment against nonresident defendants in any action "for the recovery of money" applies against such a defendant even after his general appearance if plaintiff proceeds by way of a noticed hearing—is quite doubtful.[14] But why is it anomalous that an ex parte attachment can be vacated on the defendant's general appearance, even if it could be kept alive after a noticed mini-trial on the merits of plaintiff's claim under section 538.4? Is not that "anomaly" what *Sniadach* and *Randone* are all about? We note that plaintiff had exactly two months after defendants' general appearance and before the order of February 11 dissolving the attachment, in which to notice a hearing and prove up a case meeting the "probable cause" standard of section 538.4.

The orders appealed from in 2d Civ. No. 44223 and 2d Civ. No. 44787 are affirmed.

Stephens, J., and Hastings, J., concurred.

The petition of appellant Gill for a hearing by the Supreme Court was denied December 23, 1975.

---

[14]The thrust of section 538.5, subdivision (d), is, of course, that as soon as the nonresident makes a general appearance the ex parte attachment must be dissolved unless the action is one in which an attachment is available against a resident defendant. If it is that kind of action, the nonresident is entitled to his section 538.4 hearing on the probable merits of the claim. Section 538.5 does not, however, negative the possibility that even if the action falls under section 537.1, subdivision (b)—and, therefore, the ex parte attachment must be dissolved on the defendant's motion—the plaintiff may proceed to notice a hearing on the probable merits of his action and thus keep his attachment viable. We express no view on the merits of plaintiff's position.

APPENDIX

MEMORANDUM IN SUPPORT OF S. B. NO. 1048

*Submitted on Behalf of Credit
Associations of the State of
California\**

*General Statement of the Purpose of and Need for the Legislation*

In *Randone* v. *The Superior Court,* 5 Cal. 3d 536, decided on August 26, 1971, the Supreme Court of California declared unconstitutional on their face all of the statutes providing for prejudgment attachment in the California Code of Civil Procedure, at least to the extent that they applied to any action against a resident of the State of California. It is not yet clear whether the holding of the *Randone* case will be applied to an attachment against a non-resident of the State of California. In *Property Research Financial Corporation* v. *The Superior Court,* 23 Cal.App.3d 413, decided on February 9, 1972, the District Court of Appeal in the Second Appellate District held that non-resident attachment was still permissible under the existing California statutes despite the decisions in *Randone,* but we understand that a hearing has been applied for in the Supreme Court to review this decision.

This decision of the California Supreme Court in *Randone* has created an acute crisis in connection with the collection of obligations in the State of California, particularly with respect to obligations incurred in the course of the operation of all businesses in this State. While the Court in *Randone* was concerned about the plight of a poor consumer in rendering its decision, it considered it necessary to declare the attachment statutes unconstitutional *in toto,* and indicated that it was not the responsibility of the Court to revise the statute so as to save those portions which could constitutionally be applied. The result has been that no effective remedy exists at present in the State of California whereby a creditor of a business can prevent the dissipation of its assets or take any action to collect his debt, short of waiting while an action pends on the trial calendar for perhaps two or three years, at the end of which time a judgment may well be worthless because no assets will remain to satisfy it.

The purpose of S.B. 1048 is to remedy the situation described in the preceding paragraph by enacting an interim solution which will restore the remedy of attachment in situations where it can clearly be constitutionally utilized. A Petition for Certiorari to the United States Supreme Court has been filed in the *Randone* case, but has not yet been acted upon by that Court, and cases from other states involving similar, but not identical, issues are likely to be before the United States Supreme Court in the near future. Until that Court has expressed its views regarding the issues involved in *Randone,* it would be premature to attempt to offer a solution which purported to be a final and permanent solution of the problem created by that case. On the other hand, this clarification may not be forthcoming for two or three years and in the meantime it is

---

\*The Credit Managers Association of Southern California, The Board of Trade of San Francisco, the San Diego Wholesale Credit Men's Association, the National Association of Credit Management (Northern and Central California), the Wholesalers' Credit Association (Oakland), having collectively approximately 6,200 members consisting of manufacturers, wholesalers and financial institutions in the State of California.

necessary for the economic health of the State that some form of remedy of attachment be restored in business situations (which were not before the Court in *Randone* and which its opinion indicates were not even considered by it). Therefore, this Bill attempts to accomplish the result of providing such an interim solution, pending further clarification of the constitutional parameters in this area of the law and pending completion of a study presently being conducted by the California Law Revision Commission with a view to providing a more fundamental and thorough-going revision of the entire area of creditors' remedies in this State.

*The Basic Philosophy Underlying the Provisions of S.B. 1048*

It is necessary in any revision of the attachment statutes to take into consideration the varying factual situations in which the remedy of attachment might be utilized, both from an economic and sociological point of view. In fact, the *Randone* case indicated that the primary vice in the California attachment statutes was that they failed to make such discriminations. The Court, in effect, invited the Legislature to revise the statutes to separate out those situations where a prejudgment attachment can legally and constitutionally be provided.

Specifically, the principle upon which S.B. 1048 is based is that commercial cases can and should be dealt with separately from consumer cases and that the prejudgment remedy of attachment, with a modified procedure to meet the specific objections in *Randone* to the present procedures, should be preserved in those cases where credit is extended to a business.

The California Supreme Court in the *Randone* case focused almost exclusively upon the plight "of a poor, ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up a pound of flesh." Similarly, in the recent case of *Adams* v. *Egley*, 338 F. Supp. 614, decided February 11, 1972, by the United States District Court in San Diego, the Court held that the provisions of the Uniform Commercial Code permitting repossession of property subject to a security interest without any Court proceedings were unconstitutional. However, the Court expressly stated in that case that "where . . . the parties are both commercial entities, the bargaining power is to some degree equalized, and the purported waiver of the constitutional right to prior notice and hearing may indeed be effective." However, like the California Supreme Court in *Randone,* the Court held that "even though there may be situations in which [the Uniform Commercial Code repossession provisions] would effect no violation of due process, to hold it valid on this basis would constitute extensive redrafting by this Court, and such is not the function of the judiciary."

The basic problem presented to the creditors in a situation where a business is failing is that the managers of that business (who may or may not be the beneficial owners) are almost never willing to recognize the inevitable, and will continue to run the business into the ground as long as they are permitted to do so, thereby dissipating the assets belonging to the creditors. If a business cannot pay its debts, then it belongs of right to its creditors, and not to its previous owners, and the creditors should be able to stop the dissipation of its assets. This is typically not due to any fraudulent activities of the managers or owners, but simply due to the fact that every day it keeps running it is losing money; but the managers continue to run it into the ground in the vain hope that by some miracle things will be turned around. The way in which this has been prevented in the past was through the levy by one or more creditors of a writ of attachment. At the present time this is impossible.

It is not an answer to this problem to say that the creditors can put the business into bankruptcy. The fact is that they cannot do that under the National Bankruptcy Act unless an "act of bankruptcy" has occurred. One of the most common acts of bankruptcy which has been utilized in the past as the basis for an involuntary petition in bankruptcy is the levy of an attachment by one creditor while the business is insolvent, which permits other creditors to file such a petition. However, without the remedy of attachment, if the

debtor decides to keep running but making no payment whatever to any of its creditors, the managers can survive until the last dime in the business has been used up for salaries and other expenses and nothing whatever is left for the creditors.

Whatever the situation may be in the consumer area, we believe that Legislature can legitimately make a finding that in a situation involving the loan of money or the furnishing of goods by one business to another, to which the remedy is basically restricted in S.B. 1048, the debtor will have a legitimate defense to an action to collect the debt in an insignificant number of cases. In any event, S.B. 1048 provides an opportunity for hearing where the debtor can, in such an unusual case, assert that defense before the levy of the writ.

*General Outline of the Scope of the Attachment Remedy As Provided in S.B. 1048*

1. The remedy is restricted to an action against a defendant who is "in business" by the provisions of Section 537.2 limiting the remedy to actions against corporations, partnerships and individuals engaged in a trade or business. In addition, the attachment remedy is preserved against a non-resident of the State of California, which is essential in order to preserve the possibility of the California court obtaining quasi-in-rem jurisdiction where the debtor is a non-resident but owns property located here.

2. The remedy of attachment is further limited to commercial transactions based upon contracts which are of such a nature that there would not normally be any dispute as to the fact of the obligation or the amount owed, by the provisions of Section 537.1 allowing the remedy only in an action based upon money loaned, a negotiable instrument, the sale or lease of real or personal property or services rendered. It is further required by that section that the action must be for a liquidated sum of money, in order to exclude those situations where the defendant in many cases may have a legitimate argument regarding the extent of the obligation.

3. The possibility of the use of the remedy of attachment in a manner to deprive a defendant of any necessities of life (or even many luxuries) is excluded by the provisions of Section 537.3 permitting the levy of the writ only upon specified business property. The property referred to in that section does not include any consumer goods, and, therefore, the remedy of attachment cannot be employed, even in an action based upon a business debt, to deprive the defendant of any items of property which are for his own personal or family use.

4. The constitutional objection to the present procedure whereby the plaintiff may obtain the issuance and levy of a writ of attachment without any opportunity afforded to the defendant for a hearing is cured by the provisions of Sections 538.1 and 538.4 which provide that the writ of attachment cannot be issued until after the issuance of notice of hearing and a hearing before the Court if the defendant chooses to appear and contest the right of the plaintiff to the attachment. This notice is required to be given seven business days prior to the hearing. At the hearing the plaintiff is not entitled to an order by the Court directing the issuance of a writ of attachment unless the Court finds that the plaintiff has established the probable validity of his claim.

5. Pending the hearing, it is provided in Sections 538.1 and 538.3 that the Court shall issue, without notice to the defendant, a temporary restraining order to prevent him from disposing of or concealing his assets before the hearing is held. However, the defendant is still permitted, prior to the hearing, to transfer property in the ordinary course of business and thereby to continue to operate his business until he has an opportunity to contest the probable validity of the plaintiff's claim.

6. The service of the temporary restraining order upon the defendant will, under the provisions of Section 542b, create a lien upon the personal property of the defendant, in order to preserve the priority of the creditor initiating this proceeding from that date as against other creditors of the same debtor. However, this lien is not valid as against a bona fide purchaser of the property and will terminate automatically unless the writ of attachment is ordered to be issued by the court and is actually levied by the sheriff on the property subject to the lien within thirty days.

*Section by Section Analysis of the Bill\**

*Section 537.* This section authorizes the issuance of a writ of attachment, subject to the limitations concerning the type of action in which it is available, the type of defendant against whom it is available and the type of property which may be levied upon under the writ of attachment as specified in Sections 537.1, 537.2 and 537.3.

*Section 537.1.* This section limits the remedy of attachment in an action against a resident defendant to an action for a liquidated sum of money based upon money loaned, a negotiable instrument, the sale or lease of, or a license to use, real or personal property, or services rendered. The section continues the provision of the present law that the claim of the plaintiff must not be secured in order for him to be entitled to an attachment. However, with respect to an action against a non-resident, it is only required that the action be for the recovery of money since the purpose of such an attachment is to secure quasi-in-rem jurisdiction in the California courts over non-residents and should, therefore, be equally available in tort cases as in contract cases.

*Section 537.2.* This section provides that the remedy of attachment is available against all business corporations, all partnerships and all individuals engaged in a trade or business. For all practical purposes, this excludes actions based upon the sale of consumer goods. In addition, this section provides that the remedy is available against a non-resident, including a foreign corporation *not* qualified to do business in California, or a foreign partnership which has not filed a consent to service of process, as well as a defendant who conceals himself to avoid service of summons. The exclusion of a foreign corporation which *is* qualified to do business in California and, therefore, has consented to service of process in this State changes the prior California rule that such a corporation is to be treated as a non-resident under the attachment laws.

*Section 537.3.* This section provides that all property of a corporation or partnership is subject to the levy of a writ of attachment, since all such property is necessarily devoted to business use and has been contributed by the owners of the business entity as a trust fund for the creditors of the enterprise. However, with respect to individuals engaged in a trade or business, this section limits their property subject to the levy of a writ of attachment essentially to their business assets. With respect to bank accounts, there is established a $1,000 exemption from the levy of a writ of attachment, in order clearly to avoid any situation where an individual defendant might be prevented from paying for his own and his family's necessities as a result of the freezing of all of his funds in the bank. Also, the court is given the power, upon application by the defendant, in the case of such an individual defendant, to exclude from the effect of the levy or release from the levy any property otherwise subject to levy if the court finds that it is necessary for the support of the defendant and his family. With respect to a non-resident defendant, all of his property in this state is subject to the levy (see, however, the discussion of Section 538.5, below, which provides that any such levy upon property of a non-resident, who would not otherwise be subject to the levy of a writ of attachment if he were a resident, may be released simply by the defendant filing a general appearance in the action).

*Section 538.* This section establishes the contents of the affidavit required to be filed by the plaintiff in order to obtain the issuance of a temporary restraining order and ultimately a writ of attachment.

*Section 538.1.* This section provides that the court, if satisfied that the plaintiff has established a prima facie case by his affidavits, shall issue without notice to the defendant a notice of hearing and temporary restraining order directed to the defendant.

*Section 538.2.* This section provides that the notice shall provide for a hearing seven business days after the service of the notice and that the notice served upon the defendant shall be accompanied by a copy of the complaint and the plaintiff's affidavit filed under Section 538.

---

\*Section references are to proposed new or amended sections of the Code of Civil Procedure, not to sections of the Bill.

*Section 538.3.* This section prescribes that the temporary restraining order shall basically prevent the defendant from transferring any of his property subject to attachment, otherwise than in the ordinary course of business, pending the hearing. However, it is expressly provided that the defendant may draw checks upon his bank accounts to cover any payroll, any payment for goods delivered C.O.D., in payment of taxes and in payment of legal fees for the representation of the defendant in the action. The section further provides that the restraining order shall be vacated by the Court upon ex parte application by the defendant, if the Court is satisfied that sufficient property of the defendant to secure the plaintiff's claim will be available for levy under a writ of attachment after the hearing.

*Section 538.4* This section establishes the procedure to be employed at the hearing and requires that the court shall direct the clerk to issue a writ of attachment if it finds, on the basis of a preponderance of the evidence submitted at the hearing, that proper grounds for the issuance of an attachment exist and that the plaintiff has established the probable validity of his claim. Otherwise, the court shall dissolve the temporary restraining order.

*Section 538.5.* This section prescribes those unusual situations where the plaintiff may obtain the issuance of a writ of attachment without any notice to the defendant and without any opportunity for hearing:

(1) Where the defendant has recorded and published a bulk sales notice, the writ may be issued immediately but shall be limited to the goods covered by the notice;

(2) In cases where the plaintiff establishes to the satisfaction of the Court that the defendant will transfer, remove or conceal the property sought to be attached;

(3) If the notice of hearing is in fact issued and cannot be served with the use of reasonable diligence within ten days after its issuance and the Court is satisfied that the defendant has departed from the State or conceals himself to avoid service of the notice; and

(4) If the defendant is a non-resident (and, therefore, could not be served with the notice if one were issued).

This section further provides that if the defendant is a non-resident upon whose property a writ of attachment is levied, and the writ of attachment could not have been obtained if the defendant were a resident either because of the nature of the action or the nature of the defendant, the levy will automatically be lifted if the defendant files a general appearance in the action. This confines the use of the remedy of attachment in these situations to its proper function of securing jurisdiction over the defendant. Obviously, if the defendant's property would have been subject to attachment if he were a resident, then there is no basis for permitting him to have the attachment lifted merely because he is a non-resident; however, since such defendant has not had any opportunity for a hearing as to the probable validity of the plaintiff's claim, he is granted a right by this section to request such a hearing and unless the Court makes the same findings at that hearing as required by Section 538.4, it must release the property from the attachment.

*Section 539.* This section is amended to conform it to certain provisions of the new sections which have been added, and also to provide that the damages recoverable by a defendant for the wrongful levy of an attachment shall include all damages proximately caused by the service of the restraining order or the levy of the writ, whether direct or consequential. This changes the prior California law under which the defendant could only recover the rental value of his property or interest on money which was withheld from him (plus in some cases the expenses of defending the action) as the result of the wrongful levy of a writ of attachment, in cases where the attachment is later held to be invalid or the defendant prevails in the trial of the basic lawsuit. This section is also amended to eliminate the prior limitation on the amount of the undertaking which may be required by the Court to an amount not exceeding the amount for which the writ of attachment was issued. This will permit the Court to require an undertaking in appropriate cases in whatever amount is necessary in order to give full protection to the defendant if he should later prevail in the action.

*Section 541.* This section has been rewritten to take account of the enactment of the Uniform Commercial Code in California.

*Section 542.1.* This section provides that the method of levy of an attachment upon equipment shall be by filing a notice with the Secretary of State similar to a financing statement under the Uniform Commercial Code. This avoids depriving the defendant of the use of such equipment during the pendency of the lawsuit, but preserves the lien of the plaintiff against the equipment in the same manner that the lien of a secured party is perfected and maintained by filing under the Uniform Commercial Code. There is not the same danger that a defendant will remove or conceal equipment, or simply dissipate it in ordinary business transactions, as there is with respect to inventory, receivables and bank accounts. With respect to these latter types of business property the present method of levy of a writ of attachment, by seizure of the physical property or garnishment of the account debtor or the bank in the case of an account receivable or a bank account, is preserved. The present method of levy upon real estate is also preserved.

*Section 542b.* This section has been rewritten and now deals with the lien created by the service of the notice of hearing or the levy of the writ of attachment. It provides that the service of the notice creates a lien upon all of the personal property of the defendant subject to the levy of a writ of attachment, but that such a lien is not valid against a bona fide purchaser or encumbrancer or transferee in the ordinary course of business. It further provides that such lien terminates if the writ is not levied within 30 days or if the defendant files a proceeding under the National Bankruptcy Act or makes a general assignment prior to the levy of the writ. It is further provided that the levy of the writ of attachment continues the lien created by the service of notice and perfects it as against a bona fide purchaser or a transferee in the ordinary course of business.

*Section 542c.* This section deals with the duration of a writ and provides that it will expire one year from the date of the levy unless a notice of readiness for trial is filed or judgment is entered in the action within that period. However, the plaintiff may obtain an extension of this time if he can satisfy the Court that the delay was the fault of the defendant. Under the prior law the lien of a writ of attachment continued for three years regardless of any action or inaction by the plaintiff and could be extended for two additional periods of one year each upon motion of the plaintiff.

*General.* In addition to the foregoing provisions to be added or amended in the Code of Civil Procedure, the bill adds three sections to the Corporations Code to provide that the privilege of utilizing the corporate, partnership or limited partnership form of business organization is subject to the property of those organizations being liable to attachment as provided in the Code of Civil Procedure. The purpose of these provisions is to reinforce the constitutionality of the statute as applied to those forms of business organization, which are a privilege granted by the State and can be subject to such limitations and conditions as the State may prescribe. The constitution of the State of California and the Corporations Code have "reserve power" provisions which permit the modification by the State of the privileges conferred by the grant by the State of the corporate status.

<div align="right">

Harold Marsh, Jr.
Nossaman, Waters, Scott, Krueger
& Riordan
445 South Figueroa Street
Los Angeles, California 90017