Filed 11/3/23  West Casitas v. Swing House Stages CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WEST CASITAS, LLC, | B320621 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 21STCV37974) |
| v. | |
| SWING HOUSE STAGES, INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Weinberg Gonser Frost, Christopher L. Frost and Ashley R. Morris; Rosen Saba and Michael J. Peng for Defendant and Appellant.

Shumener, Odson & Oh, Robert J. Odson and Daniel E. French for Plaintiff and Respondent.

_____

Tenant Swing House Stages, Inc. appeals from an order granting landlord West Casitas, LLC's application for a writ of attachment to secure $608,173.12 in alleged unpaid rent.[1] The sole issue on appeal is whether tenant may apply an offset to the attachment for civil penalties it claims landlord must pay to tenant for violating COVID 19-related government emergency orders. Tenant alleges landlord illegally charged it interest and late fees on the unpaid rent. Because civil penalties may not lawfully be offset from attached funds in these circumstances, we affirm the order.

### *FACTUAL AND PROCEDURAL BACKGROUND*

In 2014, tenant and landlord entered into a commercial lease for property located on Casitas Avenue in the City of Los Angeles. The 10-year lease covered the period from February 18, 2014, to February 17, 2024, with an option to renew. The lease specified annual increases in the monthly rent and by February 18, 2020, rent was $28,500 per month with a ten percent late fee if payment was not made within five days of the due date.

### *1. COVID-related Legislation*

On March 4, 2020, Governor Gavin Newsom declared a state of emergency in California arising from the COVID-19 pandemic. By executive order, Governor Newsom authorized local governments to limit residential and commercial evictions

---

[1] Attachment is a prejudgment remedy that grants a plaintiff creditor a lien on the defendant debtor's assets until final adjudication of a claim brought by the plaintiff. (Code of Civ. Proc., § 482.010 et seq; *Royals v. Lu* (2022) 81 Cal.App.5th 328, 345.)

for nonpayment of rent and other fees due to the impact of COVID-19 restrictions on a tenant's income. At the same time, the County Health Officer issued safer-at-home orders that compelled the temporary closure of nonessential retail businesses, of which tenant was one.[2]

### a. The County Resolution

In response to the Governor's executive order, the Los Angeles County Board of Supervisors placed a temporary moratorium on evictions of residential and commercial tenants via successive emergency orders or resolutions, each of which "supersede[d] all previously issued resolutions and executive orders concerning the Protections within the County."[3] The Resolution did not forgive a tenant's obligation to pay rent but allowed tenants additional time to repay any amounts due and encouraged the parties to agree to a payment plan. Relevant to this appeal, the Resolution prohibited landlords from charging late fees and interest on the unpaid rent during the moratorium period, which was extended to 2022 for commercial tenants. It also granted tenants civil remedies against landlords for violation of its provisions. The parties do not challenge the validity of the Resolution.

---

[2]  The record indicates tenant was able to reopen its business sometime after the safer-at-home orders were allowed to expire.

[3]  The trial court took judicial notice of the various County resolutions. We do not describe each iteration but identify relevant parts when the terms and provisions material to this appeal were implemented. Unless specifically identified by the date of enactment, we will refer to the resolutions collectively as the "Resolution" since only the most recent one applies.

3

On March 19, 2020, the Chair of the Los Angeles County Board of Supervisors issued an executive order that prohibited a landlord from evicting a tenant for nonpayment of rent, late charges or other fees, "if the Tenant demonstrates an inability to pay" and "has provided notice to the Landlord within seven (7) days after the date that rent was due . . . ." The executive order did not specify how a tenant could demonstrate an inability to pay. The executive order was ratified by the Board of Supervisors on March 31, 2020, via Resolution and the Board included a ban on rent increases in the Resolution.

On September 1, 2020, the Board of Supervisors revised the Resolution to prohibit "interest or late fees on unpaid rent or other amounts otherwise owed, during the Moratorium Period. Landlords are prohibited from retroactively imposing or collecting any such amounts following the termination of the Moratorium." A landlord who violated this prohibition "shall be punishable as set forth in Chapter 2.68 of the County Code." Chapter 2.68.320 specifies that any violation of an emergency rule, regulation, order or directive "is a misdemeanor, punishable by a fine not to exceed $1,000 or by imprisonment for a period not to exceed six months, or both . . . ."

On February 23, 2021, the Board of Supervisors increased the amount of administrative fines and civil penalties against landlords under the Resolution as follows: "The maximum administrative fine for violations of Paragraph VIII of this Resolution [prohibiting charging late fees or interest on unpaid rent] is temporarily increased for the duration of this Moratorium from $1,000 to up to $5,000 per violation for each day the violation continues . . . ."

4

For the first time, commercial tenants employing between 10 and 100 people were required to "provide written documentation demonstrating financial hardship, along with notice of inability to pay rent," to the Landlord within seven days after the date that rent was due.[4]

On July 20, 2021, the County Department of Consumer and Business Affairs (DCBA) issued revised guidelines to aid in the implementation of the Resolution. The DCBA suggested the written documentation of financial hardship could include bank statements, gross sales receipts, and evidence of expenses, all demonstrating a change from before the pandemic and after, as well as any applicable federal, state, and local health officer orders which demonstrated restrictions on business activity relevant to a tenant. The DCBA further stated that any tenant protections identified in the County Resolution would constitute affirmative defenses in any unlawful detainer or civil action for repayment of rental debt. It is undisputed that tenant never provided bank statements, sales receipts, or evidence of expenses to landlord to demonstrate financial hardship.

In the January 25, 2022 Resolution, the Board of Supervisors stated the eviction moratorium (now termed tenant protections) for commercial tenants would end on January 31, 2022. This is the Resolution upon which the parties relied in their briefing in the trial court. It contained the provisions described above, including the prohibition against charging late fees and interest, civil remedies for tenants, and civil penalties for violation of its provisions.

---

[4] It is undisputed that tenant employed between 10 and 100 people during the relevant time.

On March 6, 2023, when it filed its respondent's brief in this court, landlord also requested judicial notice of the most recent Resolution dated January 24, 2023, which states that "all provisions stated [in the Resolution] shall apply commencing March 4, 2020, and shall remain in effect until March 31, 2023, unless extended or repealed by the Board of Supervisors. This Resolution supersedes all previously issued resolutions and executive orders concerning the Protections within the County." We granted that request.

Paragraph VIII of the current Resolution reiterates that "Landlords shall not charge interest or late fees on unpaid rent or other amounts otherwise owed, from March 1, 2020, through March 31, 2023. Landlords are prohibited from retroactively imposing or collecting any such amounts following the termination or expiration of this Resolution."

The Resolution also continues to authorize civil remedies and penalties for violations of its protections: "Any Tenant . . . may enforce the provisions of Paragraphs V, VI, VII, VIII or IX of this Resolution by means of a civil action seeking civil remedies and/or equitable relief.[5] Landlords shall be subject to civil penalties pursuant to Sections 8.52.170 and 8.57.140 of the County Code. The maximum civil penalty for violation of Paragraph IX of this Resolution [addressing harassment and

---

[5] Paragraph V addresses the general applicability of the Resolution, including deadlines and jurisdiction; Paragraph VI describes the eviction protections; Paragraph VII prohibits rent increases in Unincorporated County areas; Paragraph VIII prohibits, among other things, interest and late fees on unpaid rent from March 1, 2020, through March 31, 2023.

retaliation protections] is increased from $1,000 to up to $5,000 per violation for each day the violation continues . . . ." [6]

### b. Other State and Local Measures

From 2020 to 2023, state and local governments enacted similar measures to halt commercial and residential evictions for nonpayment of rent due to the financial impacts of COVID-19. (See Code Civ. Proc., § 1179.01, et seq.; LAMC Ordinance No. 186606.) Although the record contains copies of some of these statutes and ordinances, the parties generally rely on the County Resolution as described above and we need not discuss in detail the other measures enacted.

## 2. The Complaint and Cross-complaint

On October 14, 2021, landlord sued tenant for breach of the lease, seeking unpaid rent in excess of $430,000. Landlord

---

[6] The parties dispute whether the civil penalties identified in this paragraph apply to commercial landlords. Chapter 8.52.160 of the Los Angeles County Code sets out the administrative fines applicable to violations of the Rent Stabilization and Tenant Protections Ordinance for residential tenants while chapter 8.57.130 sets out the administrative fines for violation of the Mobilehome Rent Stabilization and Mobilehome Owner Protections Ordinance.

We need not decide whether the "civil remedies" that a tenant may recover via a civil enforcement action includes the "civil penalties" of up to $5,000 per violation for each day the violation continues. Even if tenant may recover civil penalties under this paragraph, we conclude, as discussed below, that the civil penalties referenced in this paragraph are not claims upon which an attachment may issue.

7

alleged tenant stopped paying rent regularly beginning in April 2020.

Tenant filed a cross-complaint against landlord, its parent company, and the parent company's owner and employees for breach of contract, breach of the implied covenant of fair dealing, fraud, negligent misrepresentation, concealment, discrimination, sexual harassment, unfair competition, and violation of various statutory duties.[7]

Relevant to this appeal, tenant alleged in the eleventh and final cause of action that landlord harassed tenant by suggesting tenant committed an incurable default of the lease without any evidence or notification, illegally assessed late charges and interest, and filed a lawsuit for collection of rent before payment was due in violation of the Resolution timelines.  For these

---

[7]  The first eight causes of action in the cross-complaint are not directed to the claim of illegally charging late fees and interest but are based on the allegation that an employee of landlord's parent company began a romantic relationship with tenant's CFO without her knowledge that he was employed with landlord.  Landlord then used the personal and confidential information disclosed by tenant's CFO during this dating relationship to renegotiate the lease between the parties. Tenant further alleged that when its CFO discovered landlord's role in her dating relationship, she ended the relationship.  She then was subjected to unreasonable, unlawful, and harassing demands during the lease negotiations.

In the ninth cause of action for declaratory relief, tenant alleged it was excused from payment of rent under Civil Code section 1511 by the COVID-19 pandemic.  In the tenth cause of action, tenant alleged that landlord violated the "COVID-19 Small Landlord and Homeowner Relief Act of 2020" under Civil Code section 3273.15.  Those claims are not before us.

violations, landlord was subject to a civil action for fines of up to $5,000 per violation per day.  Tenant specifically alleged, "To the present day, approximately 316 days have elapsed since Cross-Defendant's [*sic*] began their violation of the moratorium, which multiplied by $5,000 per day for a single violation means, as at the present time, Cross-Defendants and each of them are subject to a fine and penalty of a minimum of $1,751,000 and accruing."[8]

### 3. *The Attachment Proceedings*

On April 4, 2022, landlord filed an application for a right to attach order and writ of attachment against tenant's property pursuant to Code of Civil Procedure (CCP) section 483.010.[9]  The parties do not challenge that CCP section 483.010 applies in this setting.

Landlord submitted a declaration from landlord's property manager demonstrating tenant stopped paying rent beginning April 2020 and thereafter only made sporadic payments. The property manager presented a ledger of rent owed that showed tenant failed to pay $608,173.12 under the lease, not including any late fees.  The property manager also stated tenant never

---

[8]   Tenant alleged landlord's violation of the Resolution began on March 30, 2021.  The cross-complaint was filed March 28, 2022, 363 days later.  On appeal, tenant calculates landlord's exposure to be $10,990,000.

[9]   CCP 483.010, subdivision (a), provides:  "Except as otherwise provided by statute, an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest, and attorney's fees."

9

provided landlord with financial documentation such as bank statements substantiating an inability to pay rent due to the COVID-19 pandemic, aside from a self-prepared financial statement for the year 2021. Landlord argued tenant was required to submit supporting documentation under the Resolution and the DCBA guidelines.

Tenant opposed landlord's petition, arguing, in pertinent part, that tenant was protected by the various state and local eviction moratoriums and landlord's purported damages were offset by penalties to which tenant was entitled given landlord's violations of the County's Resolution. Tenant asserted landlord's rent ledger demonstrated it illegally accrued interest and late fees from October 2020 to September 2021 and landlord attempted to pressure tenant to sign a new lease agreement that would have included the late fees and interest. Lastly, tenant argued landlord illegally seized tenant's security deposit in violation of the resolution's prohibition against such conduct. According to tenant, "[i]f this [trial] Court were to calculate violations for Landlord's interest charge accrual (submitted June 18, 2021), Landlord's late fee accruals (from October 8, 2020 through September 2, 2021) and Landlord's seizure of Swing House's security deposit on September 2, 2021 – at a rate of $5,000 per violation, per day – Landlord is facing the potential of ***millions of dollars*** in penalties."

In its opposition, tenant submitted its unverified cross-complaint alleging facts "on information and belief." Tenant's chief financial officer additionally attested in a declaration that tenant "predominantly" ceased business operations from March 2020 through August 2020, and alerted landlord about the impact

10

of COVID-19 on tenant's business via email correspondence dated 2020 and 2021, which was attached.

Correspondence filed by the parties reflected their efforts to negotiate payment of the accrued rent, including their disputes regarding landlord's attempt to include interest and late fees in its calculation of what was owed. In one email dated October 14, 2020, landlord stated, "Please note that we have withheld charging late fees for the unpaid rents since March which would total $15,657.10. As an incentive, I would be willing to waive these fees if we are able to reach an agreement on the rent and the lien within 10 days. Otherwise, these fees will be added to the balance due on October 25th."

In May and June of 2021, the parties attempted to negotiate a new lease, which contained a timeline for payment of past due rent and interest beginning January 2022 "[p]rovided that there is no law, ordinance or regulation related to the Pandemic that would prohibit Landlord from charging interest on past due rent." Tenant objected to the late fees and interest, citing to the prohibitions in the Resolution. Landlord ultimately agreed not to charge interest through December 31, 2021, and waived the late fees but asserted it believed it could begin charging interest beginning January 1, 2022. A lease ledger dated September 9, 2021, showed late fees were charged on paper from March 2020 to August 2021, but a notation of "reverse [late] fees due to pandemic" showed a credit of $31,351.00 for that time period.

At oral argument on the attachment motion, tenant claimed civil penalties were quasi-contractual in nature and therefore were available as an offset under the Attachment Law. (CCP, § 482.010.) According to tenant, the Resolution informed

11

the commercial lease between the parties during the Protections Period and must be read in conjunction with – and as an extension of – the commercial lease between the parties in an attachment proceeding. Tenant also argued that a force majeure event frustrated the purpose of the commercial lease, and tenant's performance was thus excused.

The trial court granted landlord's petition and issued a writ of attachment for $608,173.12. The trial court considered tenant's argument for an offset and determined that tenant had failed to make a prima facie case for its claims as required by CCP section 483.105. The court also concluded tort damages could not be used to offset a contract-based attachment claim. The court issued the writ of attachment after landlord posted a $10,000 undertaking as required under CCP section 489.220.

Tenant timely appealed from the order granting the writ of attachment. (CCP, § 904.1, subd. (a)(5).)

### DISCUSSION

On appeal, tenant does not argue that the issuance of an attachment order against it for the alleged unpaid rent is not permitted by statute. It instead challenges the trial court's rejection of its offset argument. Tenant asserts the amount that otherwise could be secured by the attachment order should have been entirely offset by the civil penalties owed by landlord for its violation of the Resolution, specifically the provisions prohibiting landlord from charging late fees and interest on the unpaid rent.[10] Tenant also contends landlord's seizure of tenant's

---

[10] Tenant asserts landlord violated the Resolution by charging late fees and interest but not that it ever paid any interest or late fees to landlord.

security deposit for the payment of unpaid rent violated the Resolution, but fails to cite to any part of the Resolution that prohibits this action.[11]

Landlord asserts tenant's offset argument fails in multiple ways, including that the civil penalties alleged against landlord in tenant's cross-complaint do not fulfill the requirements of CCP section 483.010 because: (1) they are not claims for money based upon an implied or express contract and (2) no statute otherwise provides for attachment under these circumstances.[12] Landlord's argument concludes that, because tenant has failed to provide sufficient evidence that demonstrates its cross-complaint is one upon which an attachment could be issued under the Attachment Law, tenant is not entitled to an offset on the attached funds.

### 1. *The Attachment Law*

" ' "Attachment is an ancillary or provisional remedy to aid in the collection of a money demand by seizure of property in advance of trial and judgment." ' " (*Kemp Bros. Construction, Inc.*

---

[11] On appeal, tenant appears to have abandoned its harassment claims as a basis for an offset against landlord.

[12] Landlord additionally contends tenant failed to demonstrate that its claims are of a "fixed or readily ascertainable amount." (CCP § 483.010(a).) Without deciding the issue, we observe that the Resolution sets out a "maximum" civil penalty of $5,000 per day for each violation. Tenant has alternately calculated landlord's total penalties to be: (1) "a minimum of $1,751,000 and accruing" in its cross-complaint; (2) "the potential of *millions of dollars* in penalties" in its opposition to the motion for attachment order; and $10,990,000 on appeal. [Underlining added.] We need not consider landlord's other challenges to tenant's offset argument.

13

*v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1476 (*Kemp*).) The procedures and grounds for obtaining orders of attachment are governed by CCP section 481.010, et seq. Because California's Attachment Law is purely statutory, it is strictly construed. (*Bank of America v. Salinas Nissan, Inc.* (1989) 207 Cal.App.3d 260, 270.)

Before an order of attachment may issue, the court must find all of the following: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the applicant has established "the probable validity" of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the request for attachment is based; and (4) the amount to be secured by the attachment is greater than zero. (CCP, § 484.090.) To establish the probable validity of its claim, the applicant must show that it is more likely than not it will obtain a judgment against the defendant on its claim. (CCP, § 481.190.)

A prejudgment attachment may secure the "amount of the defendant's indebtedness claimed by the plaintiff" as well as estimated costs and allowable attorney fees. (CCP, § 483.015, subd. (a).) The amount to be secured by an attachment shall be reduced or offset by, among other things, the "amount of any indebtedness of the plaintiff that the defendant has claimed in a cross-complaint filed in the action *if the defendant's claim is one upon which an attachment could be issued.*" (CCP, § 483.015, subd. (b)(2); italics added.) An attachment may issue "only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars exclusive of costs, interest, and

14

attorney's fees," except as otherwise provided by statute. (CCP, § 483.010.)

If a cross-complaint forms the basis of an attachment offset, section 483.015 "does not explicitly require more than a filed cross-complaint or contract defense in an answer that would itself support an attachment. However, to sustain reduction in a writ amount, most courts require that defendant provide enough evidence about its counterclaims and/or defenses to prove a prima facie case.' " (*Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 943–945 (*Lydig*), quoting Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, supra, ¶ 4:64, p. 4-18 (rev. #1, 2010).) " 'Courts are generally suspicious of vague, unsupported counterclaims and defenses.' " (*Ibid*.; see *Pos–A–Traction v. Kelly–Springfield Tire Co.* (C.D.Cal. 2000) 112 F.Supp.2d 1178, 1183.)

### 2. *Standard of Review*

" 'On appeal from an attachment order, we review the record for substantial evidence to support the trial court's factual findings. [Citation.] We apply the same evidentiary standard to an attachment hearing decided on affidavits and declarations as to a case tried on oral testimony. [Citation.] We will not disturb a determination upon controverted facts unless no substantial evidence supports the court's determination." (*Goldstein v. Barak Constr.* (2008) 164 Cal.App.4th 845, 853.) But where we are required to interpret the meaning of a statute, our review is de novo. (*Royals v. Lu, supra,* 81 Cal.App.5th at p. 344.)

### 3. *The Cross-complaint is Not Based on Contract*

The civil penalties which tenant argues should offset landlord's attachment are not claims for money based upon an

15

express or implied contract as required by CCP section 483.010. The Civil Code addresses which contracts are express or implied: "The terms of an express contract are stated in words.  (Civ. Code, § 1620.)  The existence and terms of an implied contract are manifested by conduct.  (Civ. Code, § 1621.)  The distinction reflects no difference in legal effect but merely in the mode of manifesting assent."  (*Retired Emps. Assn. of Orange Cnty., Inc. v. Cnty. of Orange* (2011) 52 Cal.4th 1171, 1178.)  Tenant does not suggest that the prohibitions and attendant civil penalties alleged in the cross-complaint are based on the parties' assent. Instead, tenant argues they were imposed by law.

Tenant advances a theory based on an implied-in-law contract or quasi-contract, arguing that it may waive its tort-based claims and instead assert claims for money had and received, unjust enrichment, or restitution.  According to tenant, these quasi-contractual theories of recovery fulfill the "implied" contract requirement of CCP section 483.010.  We are not persuaded.

Tenant did not allege causes of action for money had and received, unjust enrichment, or restitution in its cross-complaint. Nor could it have done so successfully.  In the context of the facts of the present case, for an attachment, each of these theories of recovery would have required tenant to have actually paid the interest or late fees which it claims landlord wrongfully charged. " 'The quasi-contract, or contract "implied in law," is an *obligation* . . . created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.' "  (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 639; see *Ajaxo Inc. v. E\*Trade Group Inc.* (2005)

16

135 Cal.App.4th 21, 56 [" 'restitution requires that the defendant shall give something back to the plaintiff; and it may be supposed that the defendant cannot do this unless he has received something of value at the plaintiff's hands' "]; *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 ["Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another. A person is enriched if he receives a benefit at another's expense"].)

Tenant does not contend it ever paid interest or late fees to landlord. It instead contends landlord violated the Resolution by stating that it was charging late fees and interest. Likewise, the thrust of landlord's claim against tenant is that tenant has not paid rent since 2020, much less late fees or interest on the unpaid rent. Under these circumstances, an attachment based on tenant's claims would not accomplish the restoration of tenant's "former position" by return of money it never paid.

For the same reason, we are not persuaded by tenant's broad argument that "business torts" can be pled on a quasi-contract theory that would entitle it to an offset. In each of the cases cited by tenant for this proposition, the defendant obtained money or property that rightfully belonged to the plaintiff. (See *De Leonis v. Etchepare* (1898) 120 Cal. 407, 409 [defendant agent retained rents and other amounts that he collected on plaintiff's behalf]; *McCall v. Superior Court in and for Imperial Cnty.* (1934) 1 Cal.2d 527, 529 [plaintiff buyer sought the return of money he paid for the purchase of real property]; *L.A. Drug Co. v. Superior Court in and for L.A. Cnty.* (1936) 8 Cal.2d 71, 72 [defendants failed to pay plaintiff for goods they received]; *Arcturus Mfg. Corp. v. Rork* (1961) 198 Cal.App.2d 208, 209 [employee received "secret profits and kickbacks" that belonged to the employer];

*Hill v. Superior Court in and for Alameda Cnty.* (1940) 16 Cal.2d 527, 530 [executor embezzled money from estate]; *Klein v. Benaron* (1967) 247 Cal.App.2d 607, 609 [defendant failed to repay $50,000 loan]; *Philpott v. Superior Court* (1934 1 Cal.2d 512, 518 [defendant sold worthless stock to plaintiff].)[13]  Landlord never took anything or wrongly detained anything from tenant.

We also reject tenant's reliance on *Kizer v. Cnty. of San Mateo* (1991) 53 Cal.3d 139, overruled on a different ground by *Los Angeles Unified Sch. Dist. v. Superior Ct.* (2023) 14 Cal. 5th 758 for the proposition that civil penalties may be applied as an offset and *Pintor v. Ong* (1989) 211 Cal.App.3d 837, 844 for the proposition that civil penalties are considered quasi-contractual for attachment purposes.  Neither case is an attachment case, and both are distinguishable on this ground alone.  (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 ["An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided' "].)

### 4.    *No Statute Otherwise Provides for Attachment*

Nor is attachment authorized as an aid to enforcement by the County Resolution or any statute as required under section

---

[13]    We summarily reject tenant's further arguments, unsupported by legal authority or analysis, that its claims are quasi-contractual in nature because the parties lacked an enforceable lease due to the County Resolution and landlord was somehow unjustly enriched by the writ of attachment itself. "When a party provides a brief without argument or citation of authority, we may 'treat the points as waived, or meritless, and pass them without further consideration.' " (*In re Marriage of Stanton* (2010) 190 Cal.App.4th 547, 561.)

483.010, subdivision (a), which limits attachment to contract-based claims "[e]xcept as otherwise provided by statute."  The Law Revision Commission Comments to CCP section 438.010 lists the statutes which expressly authorize civil attachment.  (Law Revision Commission Comments, 1974-1990 Rev. Comment for section 483.010; *Royals v. Lu, supra,* 81 Cal.App.5th at p. 346, n. 11 [listing statutes].)

The Resolution relied upon by tenant is not one of them.  First, the Resolution is a local ordinance, not a state statute.  (See *O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067 [discussing the interplay between local ordinance and state law].)  Second, the Resolution does not authorize or even mention attachment.  Tenant has not directed us to any statute that authorizes an attachment order for civil penalties prescribed by a local ordinance.

Finally, we are not persuaded by tenant's citation to *People ex rel. Younger v. Allstate Leasing Corp*. (1972) 24 Cal.App.3d 973, 975.  In that case, former Code of Civil Procedure section 537, subdivision 5, expressly authorized a prejudgment attachment "(i)n an action by the State of California . . . for the collection of any moneys due upon any obligation or penalty imposed by law." The Code of Civil Procedure, in which the Attachment Law resides, is a collection of state statutes; here we are dealing with local resolutions and executive orders.  (See *Lewis v. Dunne* (1901) 134 Cal.291, 293 ["Now, what is the Code of Civil Procedure?  It is merely a name given to a large part of the general laws of the state"].)

19

### *DISPOSITION*

The order granting landlord's motion for a writ of attachment is affirmed.  Respondent landlord to recover its costs on appeal.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

KIM, J.